THE BANK OF UTICA vs. MERSEREAU and others.

Where a party enters into the possession of land, claiming under a particular title, he cannot set up an outstanding title in a stranger, as a defence to a suit, brought by the owner of the title under which he entered, to recover the possession of the premises.

But a party who has gone into possession of land as the tenant of another, and acknowledging his title, is only estopped from denying the validity of that title, and setting up a better right in himself, so long as he retains the possession ; or during the continuance of the tenancy. For upon the termination of the lease and the restoration of the possession, he may sue and recover back the possession of the premises, upon showing a better title in himself.

By the common law, if a grantor who has no interest, or only a defeasible interest, in the premises granted, conveys the same with warranty, and afterwards obtains an absolute title to the property, such title immediately becomes vested in

the grantee, or his heirs or assigns, by estoppel. And if the grantor, or any one claiming title from him subsequent to such grant, seeks to recover the premises by virtue of such after acquired title, the original grantee, or his heirs or assigns, by virtue of the warranty, which runs with the title to the land, may plead such warranty, by way of rebutter, or estoppel, as an absolute bar to the claim.

This principle has been applied to all suits brought by persons bound by the warranty, or estoppel, against the grantee or his heirs or assigns; so as to give the grantee, and those claiming under him, the same right to the premises as if the subsequently acquired title, or interest therein, had been actually vested in the grantor at the time of the original conveyance from him with warranty; where the covenant of warranty was in full force at the time when such subsequent title was acquired by the grantor.

And where an estoppel runs with the land it operates upon the title, so as actually to alter the interest in it, in the hands of the heirs or assigns of the person bound by the estoppel, as well as in the hands of such person himself.

As a covenant of warranty runs with the land, so as to give the heirs and assigns of the grantee the benefit of the estoppel as against the warrantor, it runs with the subsequently acquired interest of the warrantor, in the hands of the heirs and assigns of the latter; so as to bind that interest, by the estoppel, as against any person claiming the same under him, *in the post.*

Where parties go into possession of premises claiming title thereto under a conveyance to a particular grantee, they cannot set up an outstanding title in a stranger, to defeat a person who claims the premises under the same title as themselves, but by a prior right which overreaches their claim.

Persons entering into possession of land under the defendant in a judgment, subsequent to the issuing of an execution thereon, are bound to yield up the possession to the purchaser under such execution, unless they can show a better right in themselves, or establish the fact that the judgment was invalid, as against them.

Where the breach of the covenant of seisin in a deed affects the whole title, so that nothing passes to the grantees, a recovery by such grantees for the damage sustained by the breach of that covenant, may have the effect to prevent the operation of the estoppel created by such covenant, or even by a covenant of warranty; by creating a counter estoppel, which would prevent the grantees, or those claiming under them, from alleging that they acquired the title to the land by the original conveyance to them.

Although the grantee in a deed which contains a covenant of seisin, in connection with general covenants of warranty, and the heirs and assigns of such grantee, are not estopped by such deed from showing that the grantor had no title to the land attempted to be conveyed, the warrantor, and those claiming under him, *in the post*, are estopped, by his covenants, from alleging that he had not a perfect title to the land when he conveyed the same with warranty.

Hence a reconveyance of the land, by the grantee thereof, without covenants of warranty in such reconveyance, will not prevent such original grantee from recovering for a breach of the covenant of seisin contained in the conveyance of the premises to him.

The Bank of Utica *v.* Mersereau.

Where the parties have submitted themselves to the jurisdiction of the court of chancery, without objection, the chancellor will not refuse to take jurisdiction of the case, and to make a proper decree therein, merely upon the ground that the complainant had a perfect remedy by an action at law.

But where the complainant improperly and unnecessarily comes into the court of chancery for relief, and the defendant neglects to make the objection that the remedy of the complainant, if any, was at law, whereby the chancellor is compelled to take jurisdiction of the case and to decide it upon the merits, he may, in the exercise of a sound discretion, refuse to give to either party the general costs of the litigation.

The maxim that custom is the best interpreter of the law, applied to the form of a comptroller's deed given on a sale of land for taxes; where it appeared that it had been the custom to execute deeds in the same form, for more than a quarter of a century.

The expression of Lord Coke, that common opinion is good authority in law, does not apply to a mere speculative opinion in the community as to what the law upon a particular subject is. But when such opinion has been frequently acted upon, and for a great length of time, by those whose duty it is to administer the law, and important individual rights have been acquired or are dependant upon such practical construction of the law, it is entitled to great weight.

It is not necessary that a deed given by the comptroller to the purchaser of lands sold for taxes, should be technically executed in the name of the people. It is sufficient if it recites the substance of the statutes under which the sale was made, the non-payment of the taxes charged upon the land, the advertisement and sale of the premises, the payment of the purchase money by the grantee, and that the premises have not been redeemed; and purports to convey the land to the original purchaser, or his assigns, *by virtue of the authority vested in the comptroller by law;* and is executed under the comptroller's official seal, and witnessed by one of the officers mentioned in the statute.

The statute does not require a comptroller's deed to state in what year the tax was assessed, for the non-payment of which the land was sold. Hence if the deed states that the taxes have been assessed and returned to the comptroller, and have remained unpaid for two years, this is all that is necessary to show upon the face of the deed that the comptroller was authorized to make the sale.

The prima facie evidence of ownership in the grantee afforded by a comptroller's deed, is liable to be rebutted by proof that the tax, returned to the comptroller as unpaid, had actually been paid to the collector.

Such prima facie evidence may also be rebutted by showing that the land thus sold and conveyed by the comptroller, or some part of it, was actually occupied by some person at the expiration of two years from the time of the sale, or that it was so occupied at the time of the giving of the comptroller's deed; so as to throw upon the party claiming under such deed the necessity of giving to the occupant the notice to redeem which is required by the statutes on this subject.

The effect of the several statutory provisions relative to the sale of lands for taxes, is that if the land sold by the comptroller, or any part thereof, is actually

The Bank of Utica *v.* Mersereau.

occupied at the end of the two years from the close of the sales, the purchaser, or his assignee, must serve the notice required by the act of April, 1830, upon the occupant, and file the evidence of such service with the comptroller, within the times prescribed by that act, or by the act of 1844 amending the same; or he will lose the benefit of his purchase.

Where the purchaser serves such notice and files the evidence of such service within the time prescribed, and the lands are not redeemed within the six months allowed by the act of 1830 for that purpose, his title will become perfect as soon thereafter as he shall have obtained the comptroller's deed; whether such deed shall have been given before, or after, the service of such notice.

In cases, however, where the lands sold are not occupied at the expiration of the two years, but there is an actual occupant of the land, or of any part of it, at the time of the giving of the comptroller's deed, the title of the purchaser will not become absolute, under such deed, until six months after he shall have served the occupant with the notice to redeem; and shall have obtained the comptroller's certificate that evidence of the fact of such service has been filed, and that the land was not redeemed by the payment of the redemption money into the treasury within six months after the service of such notice.

But in cases not coming within the scope of the act of April, 1830, there is no time limited by law for giving notice to the occupant of the land who was in the occupancy thereof at the time of giving the comptroller's deed. And the only effect of a neglect to give such notice is to extend the time for redemption of the land, and the perfecting of the title of the purchaser.

The fact that the occupant of the land sold is the tenant of the grantee in the comptroller's deed, will not authorize the latter to perfect his title, as against the paramount claims of others upon the land, without giving the notice to the occupant required by the statute.

If any part of the premises sold for taxes is actually occupied at the times specified in the statutes relative to the giving of notices to the occupant, the purchaser must give the prescribed notice to the occupant of such part of the premises, and obtain the comptroller's certificate that such notice was given and that the premises were not redeemed within the time prescribed; before he can complete his title to any part of the premises included in the purchase.

If the lands described in the comptroller's deed cannot be located, for want of a proper description of the tract out of which the lands sold were to be taken, the sale is invalid.

A release of the personal liability of one of several defendants, on a judgment in favor of the releasor, executed in pursuance of the provisions of the act of April, 1838, for the relief of partners and joint debtors, but which release leaves the judgment, and the debt for which it was recovered, in full force against the other defendants, will not render the defendant thus released a competent witness for the plaintiff in such judgment.

To restore the competency of such witness, if he is incompetent in consequence of any contingent liability, for the judgment debt, depending upon the event of the suit in which he is called as a witness, the plaintiff should not only release him but also the other judgment debtors from such contingent liability.

The Bank of Utica v. Mersereau.

Where it only appears from the examination of the witness himself that he is in-terested in favor of the party calling him, or that he is otherwise incompetent, the objection to his competency may be removed in the same manner that it was created. And the witness may be examined by the party calling him, to show that his interest has been removed by a release, or to prove any other fact to establish his competency at the time of his examination.

But where the witness' interest, or other incompetency, appears *aliunde*, the wit-ness cannot be examined for the purpose of showing his competency; by tes-tifying to the execution of a release, or to any other fact.

After the proofs in a cause have been closed, ex parte affidavits cannot be re-ceived for the purpose of proving that a release of a witness' interest was exe-cuted and delivered to the witness previous to his being examined.

Where a release of the interest of a witness, produced at the hearing, is neither dated nor witnessed, the acknowledgment by the party executing it is only evi-dence that he had executed it at or before such acknowledgment; not that it was executed previous to the examination of the witness, where such examina-tion was before the date of such acknowledgment.

The lands of a judgment debtor were not liable to be sold on execution, by the English common law; but by the statutes of extents and elegits they were set off to the judgment creditor until his debt should be paid.

The statute of 32 Hen. 8, chap. 5, giving a remedy to the creditor to whom the debtor's land had been delivered in extent, upon elegit, where the tenant by elegit was afterwards evicted out of or from the possession of, such land, being a part of the general law of England at the time of the first settlement of New-York under the charter to the Duke of York, it became a part of the common law of the colonists; in connection with the principles of the statutes of extents and executions then existing in England. But when the statute of 5 Geo. 2, chap. 5, subjected real estate in the colonies to sale upon execution, in the same manner as personal property, the writ of elegit was virtually abolished here.

The equitable principle of the statute of 32 Hen. 8, chap. 5, however, still applied to the case of a creditor who had purchased the real estate of his debtor, upon execution. And it continued to be a part of the law of the colony; though the particular form in which the relief had been given was no longer strictly appli-cable to the sale under an execution. The court of chancery, therefore, has jurisdiction to act upon the equitable principle of the English statute, by giv-ing relief to the purchaser at a sale of lands upon execution, for an eviction, or failure of title; upon an application to the equitable powers of that court.

Where the plaintiff in a judgment is himself the purchaser, and has been evicted for want of title in the judgment debtor, his remedy still depends upon the equi-table principle of the colonial law, derived originally from the statute of Hen. 8, as applied to sales of land upon execution; which equitable principle has been applied, by analogy, to sales of personal property, &c. where the plaintiff became the purchaser and was subsequently deprived of the benefit of his pur-chase for want of title in the judgment debtor.

Where the common law does not provide for such cases, they are proper subjects

The Bank of Utica *v.* Mersereau.

for the interference of the court of chancery; or for relief upon a summary application to the equitable power of the court out of which the execution issued.

This equitable principle applies to a case where a judgment creditor purchased premises at a sale thereof by the sheriff, under the judgment, in the belief that the title was in the judgment debtors, or one of them, at the time of the docketing of the judgment; and where the judgment debtors, in a statement of their property, furnished to the judgment creditor, and others, previous to such sale, had represented that they were the owners of the lands subsequently sold and bid off by the judgment creditor.

In the court of chancery, where many issues frequently are combined in one suit, a witness is not to be rejected altogether because he is interested as to one part of the case, when as to another part of the case he has no interest whatever. He may be examined as a witness to that part of the case in which he has no interest; or in which his interest is adverse to the party calling him.

The true principle, in reference to privileged communications between attorney and client, is that where the attorney is professionally employed, any communication made to him, by his client, with reference to the object or the subject of such employment, is under the seal of professional confidence, and is entitled to protection as a privileged communication.

This seal of professional confidence is not the seal of the attorney, but of his client, which the attorney is by law as well as by professional honor bound to keep intact; and it cannot be removed except by the consent of the client.

The seal which the law once fixes upon such communications remains forever, unless removed by the party himself in whose favor it was there placed.

And where the privilege belongs to several clients, *it seems* that neither one of them, nor even a majority, contrary to the expressed will of the others, can waive the privilege, so as legally to justify the attorney in giving testimony in relation to such privileged communications; especially in a case where the testimony of the attorney equally affects the moral characters of all his clients, by showing that they employed him professionally to assist them in giving a fictitious judgment for the purpose of defrauding their creditors.

Nor will the fact that the client, whose assent to the removal of the seal of professional confidence from privileged communications has not been obtained, is not a party to the suit in which his attorney is called upon to testify, alter the case.

Neither will the fact that an attorney was a subscribing witness, to a warrant of attorney prepared by him for his clients to execute, alter the question as to the admissibility of his evidence tending to the conclusion that the object of giving the warrant of attorney, and having judgment entered thereon, was to hinder and delay their creditors in the collection of their debts; and that the judgment was given for a much larger sum than was justly due to the judgment creditor.

But an attorney who is professionally employed to prepare a deed for his client, and who afterwards witnesses its execution, may be compelled not only to prove the execution of such deed, but also to testify whether it was ante-dated;

The Bank of Utica *v.* Mersereau.

whether it was in the same form in which it now appears, at the time of its execution, or has been altered; and whether it was actually delive·ed at the time he subscribed his name thereto as a witness.

And if the deed has been lost, or is in the hands of the adverse party, who refuses to produce it upon the trial, or for the purposes of the suit, the attorney who witnessed the deed may be compelled to testify as to the contents thereof; although in the preparation of such deed he was professionally employed.

*It seems* the seal of professional confidence has never been held to cover a communication made to an attorney to obtain professional advice or assistance as to the commission of a felony, or other crime which is *malum in se*.

But the fact that an attorney was employed by his clients to assist them in a transaction which, from what was said in his presence, he must have known to be a fraud upon their creditors, will not deprive their communications of the seal of professional confidence.

The privileged relation of attorney and client, however, ought only to be permitted to exist for honest purposes, and not to enable the client to perpetrate a fraud, or to violate the laws under the advice of counsel, or through any other professional aid. But the law appears to be settled otherwise.

THIS case came before the chancellor upon appeal from a decree of the vice chancellor of the eighth circuit.

At the time of the death of Harmanus Garretson, in 1813, he and Gosen Ryers were the owners, as tenants in common in equal shares, of the north half of township No. 1, in the second range of townships in the county of Steuben, containing about 11,500 acres of land; excepting out of the same 600 acres which they had previously conveyed. H. Garretson by his will authorized and directed his executors, J. Garretson, J. Guyon and P. I. Van Pelt, to sell his interest in this tract of land, and to pay one half of the proceeds of the sale to his son John, and the other half to his two daughters, Dinah Mersereau and Margaret Guyon. In 1814, the executors sold and conveyed the undivided half of the premises of which their testator died seised, to Joshua Mersereau, jun.; and took back a bond and a mortgage upon the premises to secure the payment of $4777,50, of the purchase money. The purchaser went into possession of the premises, with his family, the succeeding winter, and contracted to sell some parts thereof.

In October, 1817, W. Smith recovered a judgment against Joshua Mersereau, jun. which became a lien upon the interest of the latter in the premises. And in January thereafter G. R.

De Hart who had become entitled to an undivided interest, as tenant in common, in the other half of the premises, commenced a suit for the partition of the whole premises; proceeding against the owners of the half of which H. Garretson died seised, as owners whose names were unknown to him. J. Mersereau, jun. not being able to pay the amount due upon his bond and mortgage, entered into an agreement with them for a reconveyance of the premises and a cancelment of his mortgage. And on the 9th of February, 1818, he conveyed his undivided half of the premises to J. Garretson, J. Guyon, and Peter I. Van Pelt, describing them as executors of the last will and testament of H. Garretson deceased; with covenants of warranty and seisin and for further assurance. The mortgage which had been given to the executors for the purchase money upon the original sale was thereupon given up and cancelled.

On the 28th of February, in the same year, the sheriff of Steuben county sold the undivided half of the premises, by virtue of an execution issued upon Smith's judgment against J. Mersereau, jun. to E. Lindsley; and in March, 1818, he conveyed the same to the purchaser at such sale. The commissioners, appointed in the partition suit, assigned as the share of the unknown owners in the premises 5450 acres on the west side of the Tioga river, being the whole of the premises on that side of the river, except a lot of 292 acres set off in the partition to Joseph W. Ryers, and a small lot containing one acre and a half assigned to G. R. De Hart. And judgment thereon was given in September, 1818, and the land set off as the share of the unknown owners was charged with one half of the costs of the partition. The sheriff, by virtue of an execution issued upon the last mentioned judgment, sold and conveyed to E. Lindsley 1000 acres of the land assigned to the unknown owners, adjoining the south bounds of the said lands. In September, 1819, Lindsley and wife conveyed to Dinah Mersereau 546 acres of the premises set off to the unknown owners in the partition, south and adjoining the 292 acre lot assigned to J. W. Ryers, as one of the heirs of John P. Ryers, in the partition

suit; and extending west from the Tioga river to the westerly bounds of the tract assigned in the partition suit to the unknown owners. At the same time they conveyed to her 35 acres in the southeast corner of the 1000 acres sold by the sheriff for the costs of the partition suit, bounded north by B. Harrower's land, which had been previously sold to him by Lindsley, and west by J. Hemstead's land, and east by the Tioga river. The Harrower lot was 211 acres lying some where between the two pieces conveyed to Dinah Mersereau, bounded on the Tioga river and extending west a little farther than the west line of the 292 acres set off to Ryers in the partition. The conveyance by Lindsley to Dinah Mersereau, was made under an arrangement with her son, Joshua Mersereau, jun., by which she was to receive this portion of the premises in satisfaction of her one-fourth of the proceeds of the sale of the land, under the will of her father; and the same was allowed to Joshua Mersereau, jun. by the executors, in the subsequent settlement with him. In December, 1819, an arrangement was made between Lindsley, and Joshua Mersereau, jun. and John Garretson, who professed to act in behalf of himself and his co-executors, by which Mersereau was to pay Lindsley for his interest in the lands, under the sheriff's deed, and to receive a conveyance of such parts of the land as had not been previously conveyed by Lindsley. And he was to pay to the executors the amount due upon his original purchase, after deducting therefrom the one-fourth, that by the will of his grandfather belonged to Dinah Mersereau, his mother; to satisfy which one-fourth he had procured a conveyance to be made, to her, of the 581 acres embraced in the deed of Lindsley and wife to her in September, 1819. A part of this balance the executors were to receive in the bonds and mortgages of the purchasers of different portions of the premises, that were to be conveyed to Mersereau by Lindsley and wife; and the residue was to be secured by Mersereau's bond and mortgage upon about 3000 acres of the same premises.

In pursuance of this arrangement, Lindsley and wife, on the 15th of December, 1819, conveyed to Mersereau the whole of

the premises set off to the unknown owners in the partition suit, except the 581 acres embraced in the deed to his mother, and the 211 acres which Lindsley and wife had previously conveyed to B. Harrower. On the 16th of the same month, Mersereau and wife gave a bond and mortgage to J. Garretson and, his co-executors, upon about 3000 acres of the same premises; conditioned for the payment of $1700, in five yearly payments, commencing on the first of July, 1822, with annual interest from the date of such bond and mortgage. Mersereau also conveyed several parcels of the premises, not embraced in this mortgage to the executors, and took back from the purchasers bonds and mortgages upon the lands thus conveyed to them; which J. Garretson received, for the executors, in payment of the balance of their claim against Mersereau that was not covered by the $1700 bond and mortgage. And Mersereau having requested that the executors would give him some evidence that he was entitled to the lands which were not covered by their $1700 mortgage, J. Garretson gave to him a certificate that he and his co-executors held no other lien upon the premises except the mortgage of Mersereau, to them, of the 16th of December, 1819. Mersereau continued to reside on and to exercise acts of ownership over the lands conveyed to him by Lindsley and wife, until the spring of 1821; when he went to Pennsylvania to reside, and left the cultivated parts of the premises, not previously sold by him, in the possession of his tenants. He died in the autumn of 1821, very much embarrassed and leaving some judgments against him, which were liens upon his interest in the premises. His only child and heir Jane Maria, who afterwards married T. R. Budd before the termination of her minority, was then an infant between seven and eight years of age; and upon the death of her father, some of her relatives assumed to rent the cultivated portions of the premises in question. In the fall of 1822, the first instalment of principal upon the $1700 mortgage having become due, J. Garretson requested B. Harrower to take charge of the premises, and rent the cultivated parts thereof to keep down the taxes on the whole premises, and he rented the same accordingly.

The executors also bought up a judgment of $433, which C. Strong had recovered against Mersereau in his lifetime, and which was a lien upon his interest in the premises.

On the 20th of January, 1831, John G. Mersereau who was the assignee and owner of a judgment of about $300 against Joshua Mersereau, jun. and the assignee and owner of the half of two other judgments against him, for upwards of $1200, made an agreement with the executors of H. Garretson, to purchase of them the Strong judgment, and the $1700 mortgage, and the several mortgages which remained unpaid, given by the purchasers of different portions of the premises included in the sheriff's deed to Lindsley, which had been taken by the executors in their compromise with Joshua Mersereau, jun. in December, 1819. The mortgages and judgments were assigned to him accordingly. On the same 20th of January, 1831, J. Garretson and P. I. Van Pelt, the two surviving executors of H. Garretson and H. Guyon, who is described in the deed as the executor of J. Guyon the deceased executor, released and quit-claimed to John G. Mersereau, all the lands set off to the unknown owners in the partition suit, except the two Pier lots of 100 acres each in the northwest corner of the tract, which were not included in the $1700 mortgage; and also excepting from the lands embraced in the boundaries of the deed the land conveyed by John Garretson to Cyrus Strong, the lands of B. Harrower and of Dinah Mersereau; and also the lands of W. French, W. Chilson, A. Butler, D. Butler and J. Upham, as the same were described in their several mortgages.

Soon after the execution of this deed, the agent of John G. Mersereau contracted to sell 1000 acres off of the north end of the premises described therein, to M. Lewis, and two other persons of the same name; and they moved on to the premises, and improved parts thereof and exercised acts of ownership over the rest of it for three or four years; when they abandoned their contract and left the premises. In September, 1831, John G. Mersereau took possession of other parts of the premises described in the quit-claim deed to him; and exercised acts of ownership over the same beyond the boundaries of

the 3000 acres included in the $1700 mortgage to the execu-
tors.   He built a dwelling house, barn and saw-mill thereon, and
moved into the house with his family; contracted for the sale of
several parcels of the premises in fee, and executed conveyances
to the purchasers of some of those parcels; and claimed to be
the owner of the premises so far as the same remained unsold.
In the spring of 1832 he entered into an agreement with Chan-
cey Hoffman and James G. Mersereau to go into copartnership
in the lumbering business, &c; and he was to convey to each of
them an undivided one-third of the unsold portion of the premi-
ses embraced in the quit-claim deed of the executors to him,
north of the Helmer or Dinah Mersereau lot, and south of the
1000 acres contracted to be sold to the Lewises; and they were
to pay equal proportions with him of the $3200 which he had
agreed to pay to the executors of H. Garretson.   And the sum-
mer following their partnership business commenced in lumber-
ing and farming and merchandising; which partnership was
to be continued for three years.   They also purchased the two
Pier lots of 100 acres each, lying north of the 1000 acres con-
tracted to the Lewises; which Pier lots were not embraced in
the quit-claim deed given to John G. Mersereau in January,
1831.   Hoffman moved on to the Pier lots, and James G. Mer-
sereau on to the premises which were to be held by the three
partners in common.   They built a store and a saw-mill and
made other valuable improvements upon the premises, and
carried on an extensive business in lumbering, farming and
merchandise during the three years which the partnership was
to be continued by their agreement.   In the prosecution of this
business, the copartners became indebted to the complainants,
and to the Steuben County Bank, and to the Chemung Canal
Bank, in large sums of money, and ultimately became insolvent.
In the spring of 1833, the copartners, who transacted the busi-
ness of the firm under the name of Hoffman & Mersereau, rafted
and sent to Port Deposit, in the state of Maryland, a large quan-
tity of lumber.   And in conjunction with N. Pearsall they pur-
chased a large quantity of lumber at the last mentioned place,
or the value of about $28,000; which was equally divided

between Pearsall and the firm of Hoffman & Mersereau. In September, 1833, Hoffman entered into a copartnership with G. Love and J. S. Pickering of Philadelphia, in the business of buying and selling lumber, under the copartnership name of Love, Pickering & Co., and Pearsall sold to that firm his part of the lumber purchased by him in connection with the firm of Hoffman & Mersereau, at Port Deposit, the summer previous, and received therefor the notes of Love, Pickering & Co. to the amount of $13,000, payable at different times, which notes were endorsed by Pearsall and afterwards came into the hands of H. McEldery, and two of them were paid when they became due. Pickering and Love shortly afterwards became insolvent.

In the spring of 1834, Hoffman & Mersereau obtained, by manufacture and purchase, other large quantities of lumber, consisting of about a million and a half feet of joist, plank and boards, and two hundred and eighty thousands of shingles; which lumber was rafted and sent down the Susquehannah for Port Deposit. And in June of that year a large amount of paper which had been discounted by the Steuben County and Chemung Canal banks respectively, for Hoffman & Mersereau, had fallen due and was unpaid. The firm was pressed by the claims of other creditors, and its credit was very much questioned. Hoffman made out a statement of the debts and liabilities of the firm, and of its property and effects, from which it appeared that Hoffman & Mersereau owed to the Bank of Utica about $17,000, to the Steuben County Bank $14,000, to the Chemung Canal Bank $10,500; and to other creditors about $17,325, including the amount of several mortgages upon the real estate of the firm. This statement, a copy of which was sent to each of the three banks, also showed that the estimated value of the property of Hoffman & Mersereau, including 4100 acres of the land embraced by the quit-claim deed of Garretson and others, and the two Pier lots, and the mills and other improvements on the premises, and about $50,000 worth of lumber at Port Deposit and in rafts on their way to that place, was nearly double the amount of the debts of the firm. Soon after this statement was furnished, an arrangement was

made between the several cashiers of these three creditor banks, by which Magee was sent to Philadelphia, as the agent of the several banks, to see Hoffman, who was then there, and to induce him and the other members of the firm of Hoffman & Mersereau to make such a disposition of their property in Pennsylvania, and at Port Deposit, as would secure the proceeds of it for the benefit of the three banks. Upon the arrival of Magee at Philadelphia, Hoffman declined making any arrangement for the security of his New-York creditors, and he ultimately refused to assign the property of the firm in Pennsylvania, and at Port Deposit in Maryland, for the benefit of the three banks. But after a good deal of negotiation he finally consented and agreed that the firm should mortgage the lumber at Port Deposit to the Bank of Utica to secure the debt due to that institution, and should reduce the debt of the Steuben County Bank to the same amount as that of the Chemung Canal Bank, and give a mortgage upon the lands of the firm in Steuben county to the two last named banks to secure the remainder of their indebtedness to those banks. Information of this arrangement was communicated by letter to the cashier of the Bank of Utica, and personally to the cashier of the Chemung Canal Bank. In conformity with this arrangement J. C. Groom, an attorney at Elkton, in Maryland, was employed to draw a chattel mortgage, to the Bank of Utica, of all the lumber of the firm at Port Deposit, and in the Susquehannah canal, in the state of Maryland, to secure the payment of the several notes and drafts upon which they were liable to that bank, amounting in the aggregate to $17,500, and the interest thereon; in conformity to the requirements of the laws of Maryland on that subject. He prepared a chattel mortgage accordingly, on the 2d of August, 1834; conditioned for the payment of the amount of the said notes and drafts on or before the first of December thereafter. This mortgage was executed and duly acknowledged by Hoffman and James G. Mersereau, the same day, and delivered by them to Groom for the benefit of the mortgagee. He caused the same to be recorded, as required by the laws of Maryland, on the 4th of August, 1834, and sent

---

---

a copy thereof to Hoffman ; who immediately transmitted the same by mail to the Bank of Utica, and requested copies of the several notes and drafts referred to and secured by the mortgage to be transmitted to Groom. On the 13th of the same month the cashier of the bank enclosed such copies to Groom accordingly and sent the same by mail ; accompanied by a short note to Hoffman, stating that the bank would be governed by his wishes in relation to appointing the agent.

Soon after the execution of the mortgage, James G. Mersereau left Port Deposit and returned to Steuben county, leaving the lumber in the care of D. Chamberlin and D. K. Fitch, under the direction of Hoffman, who assumed the control of it, professing to act as the agent of the Bank of Utica. A part of the lumber was sent to Philadelphia and put into a lumber yard at that place, under the care of Hoffman, for sale. In the fore part of September, 1834, Hunt, the cashier of the Bank of Utica, having private business at Philadelphia, called to see Hoffman, and to converse with him on his affairs with the bank. But finding he was absent from the city, Hunt, upon his return to New-York, on Saturday evening, the 13th of September, wrote to Hoffman in reference to the call at Philadelphia, as follows : " I simply called to consult upon your best interests. I have nothing to ask. You have done all that an honorable man can do—more than I asked—I am satisfied. The whole story is told in a sentence—markets are bad ; you have gone too largely, and time must be given to wait the markets, even for a year, rather than ruin honest men who can if treated kindly pay forty shillings on the pound. The only apprehension I had was that some of your small creditors, being very greedy, might commence suits, and obtain judgments in October, and thus embarrass you. This ought to be prevented, because equal and exact justice should be done to all. In case you feared any result of this kind, I had intended to have suggested that in order to defend yourself against the assaults of those who want more than their own, you might *give the bank a judgment,* and the bank will give you the complete control of it in your own hands. I don't want it for our

security. I am satisfied to rest it upon your own honor. I always was satisfied. I also wanted, if I could have seen you in Philadelphia, to have executed a formal power of attorney, constituting you the agent to sell, and receive the avails of, all property assigned to the bank. But Mr. Love it seems would not see me. Now what I would say is that, as I am here on a jaunt of pleasure, I will wait to see you here or in Philadelphia as you please; and I know we can arrange all things for the advantage of those who now will have sound confidence in each other." This letter was post marked at New-York, on the 14th of September, and was addressed to "Chancey Hoffman, Esq., care of Giles Love, Philadelphia." But when it was received by Hoffman, who returned to his residence in Steuben county, about that time, did not appear. Upon the return of Hoffman to Steuben county he was very reluctant to consummate the agreement made with Magee, at Philadelphia, to secure the debts due by Hoffman & Mersereau to the Chemung Canal Bank, and the Steuben County Bank, by mortgage upon the lands of the firm in Steuben county. But by arrangement a meeting was agreed to be held between the members of the firm and a committee on the part of each of those banks, to decide what should be done relative to giving such security. A meeting was held accordingly at Painted Post on the 17th or 18th of September, 1834, at which Hoffman and James G. Mersereau agreed to give the mortgages, as soon as John G. Mersereau and his wife, who were temporarily absent, should return. Soon after this meeting the members of the firm of Hoffman & Mersereau agreed among themselves to give a judgment to the Bank of Utica, which should be entered up secretly, after the agents of the other banks had made their searches for incumbrances preparatory to the taking of their mortgages, so as to give the judgment a preference over those mortgages; and that such judgment should be given for a larger amount than was due from them to the Bank of Utica; as the defendants insisted their proofs in the cause showed. Hoffman & Mersereau employed H. G. Cotton of the firm of Cotton & Johnson, attornies at Painted Post, to draw the bond

and warrant and enter up the judgment in favor of the Bank of Utica. The bond and warrant were drawn by him accordingly; and were executed by Hoffman and the two Mersereaus, on the 20th of September, 1834. The bond was in the penalty of $45,000, and was conditioned for the payment of $22,746.22, with interest; and the warrant of attorney, to which Cotton was the subscribing witness, authorized the entry of a judgment upon the bond for the amount thereof. The judgment was entered up in the name of Johnson as the plaintiffs' attorney; and Cotton his copartner, who prepared the papers for the defendants therein, signed the cognovit as their attorney on the record. The papers were completed with the exception of signing the record and taxing the costs, and were delivered to Hoffman, under cover to the agent of Cotton & Johnson at Utica, to have the judgment perfected. Hoffman took the papers to the Bank of Utica; where under the direction of its officers a statement was appended to the judgment record and other papers, purporting to be a correct detail of the amount of the several notes, drafts and acceptances then held by the bank, and for the payment of which Hoffman & Mersereau were then liable, amounting in the aggregate to $26,712; which statement Hoffman certified to be correct. The record and statement, and the bond and warrant and other papers, were then delivered to the law agent of Cotton & Johnson, to be signed and filed, on the 10th of October, 1834. And he caused the entry of the judgment to be perfected accordingly, on the same day. The Bank of Utica at the same time discounted for Hoffman two notes of $1250 each, drawn by him and endorsed by John G. Mersereau and James G. Mersereau, dated on the 10th of October, 1834, payable at three and four months; upon which notes, in October, 1836, they recovered a judgment against the drawer and endorsers.

On the 3d of November, 1834, the arrangement for the giving of the mortgage to the Steuben County Bank was consummated; at which time, for the purpose of defrauding this bank, and inducing its officers to give time to Hoffman & Mersereau for the payment of the debt due from that firm to the bank,

The Bank of Utica *v.* Mersereau.

C. Hoffman, in the presence of his copartners, and without any dissent from them, falsely represented to the officers and agents of the bank that there were no incumbrances upon the premises which they were about to mortgage to such bank; except two small mortgages specified, and some small judgments which were secured by a levy upon personal property. The Steuben County Bank thereupon received from Hoffman and the two Mersereaus their bond for $12,000 of the debt, payable in four yearly payments, commencing in July, 1836, with annual interest, and their note for the balance of the debt; which bond for the $12,000 was secured by their mortgage of the 2d of December, 1832, upon the undivided half of about 3500 acres of the premises set off to the unknown owners in the partition suit, in two separate parcels; the first of which parcels was bounded on the north and west by the township lines. on the south by the Helmer or Dinah Mersereau lot, and the Marks lot, and on the east by the Tioga River and a line running south two degrees and thirty minutes west from the northwest corner of the Marks lot to the north line of the Helmer or Dinah Mersereau lot, excepting out of the same the small pieces of land described as the A. C. Smith lot, the Morris Johnson lot, and the school house lot. And the second parcel of the mortgaged premises consisted of lots Nos. 17, 18 and 19, situated in the southwest corner of the premises set off to the unknown owners in the partition suit, bounded on the north by the Helmer, or Dinah Mersereau lot, and extending east to lots No. 13 and 14. On the 23d of December, 1834, Hoffman and and the Mersereaus gave a bond and mortgage to the Chemung Canal Bank on the other undivided half of the same premises, to secure the payment of $10,422,93 due to that institution.

On the 17th of October, 1834, the lumber mortgaged to the Bank of Utica was attached by the sheriff of Cecil county, in Maryland, in a suit of H. McEldery against G. Love, J. S. Pickering and C Hoffman, as the copartners composing the firm of Love, Pickering and Company. The lumber remained in the custody of the sheriff until April, 1835, when the attachment was discharged or the property released from the operation

thereof, by order of the court; and it was subsequently sold or disposed of by Hoffman, and others under him, who professed to act as the agent of the Utica Bank in relation to such lumber. But there was no proof in this case that any part of the proceeds of the lumber was applied by him to the payment of the debts due from the firm of Hoffman & Mersereau to that bank. In December, 1835, Hoffman & Mersereau having failed to pay their note, to the Steuben County Bank, which was given for the balance of the debt beyond the $12,000 mortgage, a judgment was confessed to that bank for the amount. And in the spring of 1836, they being then insolvent, and execution being about to be issued against them which might reach their personal property, the Bank of Utica caused an execution to be issued upon its judgment and to be levied upon the personal property of the defendants in the county of Steuben; in which execution the sheriff was directed to levy the whole amount mentioned in the condition of the bond upon which the judgment was entered, and the costs. The sheriff raised from the sale of the personal property about $2000.

On the 28th of July, 1836, John G. Mersereau and James Mersereau, who were in possession of the premises mortgaged to the Steuben County Bank and the Chemung Canal Bank, except the part embraced in the Pier lots, upon which Hoffman resided, surrendered the possession thereof to those banks as the mortgagees thereof. And the banks thereupon furnished teams, carriages, &c. and employed the Mersereaus to carry on the business of lumbering and farming upon the premises, as the agents of those banks, until November, 1837. On the first of November, 1837, the two lots of 100 acres each, called the Pier lots, were sold by a master in chancery, under a decree for the foreclosure of a mortgage given by John G. Mersereau to Ethan Pier, and assigned to W. Wambaugh, and were purchased by Wambaugh and conveyed to him by the master on that day; and Hoffman thereupon attorned to Wambaugh and become his tenant.

On the 7th of September, 1837, the Steuben County Bank having ascertained that the equity of redemption of Joshua

Mersereau, jun. in the 3000 acres mortgaged by him to the executors of H. Garretson had not been foreclosed, obtained a quit-claim deed from Budd and his wife, of the interest in the mortgaged premises to which she was entitled as the sole heiress of her father, subject to such rights as the grantees in that deed had acquired under their mortgages from Hoffman & Mersereau.    On the 4th of November, 1837, the two defendant banks leased the premises which had been mortgaged to them by Hoffman & Mersereau to T. L. Mersereau for one year, at a rent of $600.    And he thereupon entered into the possession of the premises thus leased, except the two Pier lots, which had been previously sold to Wambaugh at the master's sale, and which Hoffman then occupied as his tenant.    T. L. Mersereau continued in possession as the tenant of the Steuben County and the Chemung Canal banks until after this suit was commenced.    Six days after the execution of that lease, the sheriff of Steuben county, by virtue of the execution upon the large judgment of the Bank of Utica, sold at public auction all the right and title of the defendants in that judgment, to the premises embraced within the boundaries of the two mortgages given by them to the Steuben County and Chemung Canal banks, including the Smith lot and the Johnson lot and the school house lot, which were excepted by such mortgages ; and also about 118 acres of land on the east side of the Tioga river. The premises thus sold were struck off to the Bank of Utica, and on the 19th of April, 1839, were conveyed by the sheriff, to the purchaser, in the usual form.

At a comptroller's sale for taxes in April and May, 1830, there was sold 800 acres of land, to be laid out in a square form, as nearly as might be, in the northwest corner of 2401 acres in township No. 1, assessed to John Garretson, and described in such assessment as being bounded on the south by Joshua Mersereau and others, west by the town line, north by Rathbone and the town line, and east by the Tioga river and Ryers and others.    The 800 acres thus sold not having been redeemed within two years after the sale, and the Steuben County Bank having become the owner of the comptroller's

certificate of sale, by assignment thereof, the 800 acres were conveyed to that bank on the 2d of December, 1837, by the deed of the comptroller, under the seal of his office, in the usual form of deeds given by him upon the sale of lands for taxes, and attested and witnessed by the deputy comptroller. In May, 1838, the agent of the Bank of Utica offered to redeem the lands thus conveyed by the comptroller, and tendered a sum sufficient for that purpose if the right to redeem then existed. And on the 6th of December, 1837, John G. Mersereau, in payment or security of part of the indebtedness of Hoffman & Mersereau to the Steuben County Bank, assigned to that institution the $1700 bond and mortgage which had been assigned to him by the surviving executors of H. Garretson in January, 1831.

The complainant filed the bill in this cause, in November, 1839, against The Steuben County Bank, The Chemung Canal Bank, and John G. and James G. Mersereau, to obtain possession of the premises described in the sheriff's deed to the Utica Bank, and to set aside the several deeds, assignments and transfers of John G. Mersereau, and of Budd and wife, and of the comptroller to the Steuben County Bank, and the surrender of the possession of the premises made to the defendant banks by. John G. and James G. Mersereau, or for a decree declaring such conveyances, assignments and transfers to be held in trust for the use and benefit of the complainant, or for such other and further relief as should be proper, upon the case made by the bill. An answer on oath being waived, the defendants put in their joint and several answer, without oath, admitting most of the facts charged in the bill, but denying that John G. Mersereau or Hoffman & Mersereau, or any of the members of that firm were the owners of the premises on the west side of the Tioga river described in the sheriff's deed to the complainant at the time of the docketing of the judgment against Hoffman & Mersereau on the 10th of October, 1834, or at any other time ; and charging, among other things, that the judgment confessed by them to the complainant, under which the premises were sold by the sheriff in 1837, was given for a much larger sum than was actually due from Hoffman & Mersereau to the com-

plainant, and for the fraudulent purpose of delaying and injuring the Steuben County Bank and the Chemung Canal Bank, and other creditors of Hoffman & Mersereau in the collection of their debts.

A replication having been filed to the answer, a large mass of evidence was produced in the cause; the testimony of one witness, exclusive of the exhibits referred to therein, amounting to more than 3000 folios. Among other witnesses produced and examined on the part of the defendants, they called and examined H. G. Cotton, the attorney employed by Hoffman & Mersereau to draw the bond and warrant and to enter the judgment against them in favor of the complainant, to prove that the judgment was fraudulent. His testimony was objected to by the complainant's counsel, but was received by the exami ner. Chancey Hoffman was called and examined as a witness for the complainant, although objected to by the defendants as interested in favor of the party calling him. The cause was heard by the vice chancellor of the eighth circuit upon pleadings and proofs. And the complainant moved to suppress the deposition of Cotton, and the defendants made a like motion as to the deposition of Hoffman. A similar motion was made on the part of the defendants to suppress the deposition of W. G. Wells, another of the complainant's witnesses.

The vice chancellor ordered and decreed that the deposition of Hoffman should be suppressed, with costs; and that the applications to suppress the depositions of the other two witnesses respectively be denied, with costs. He further declared and decreed that the complainant had acquired a title to the two parcels of land described in the sheriff's deed to the complainant on the west side of the Tioga river, except as to the two Pier lots, the Smith lot, the Johnson lot, the school house lot, and a small lot claimed by R. Marks. And that the title and claims to the said lands set up by the defendants, or any of them, were invalid as against the title of the complainant acquired by the sheriff's deed. He further declared and decreed that the complainant was entitled to the possession of the said lands; and that the defendants or any person or persons who

had come into possession under them since the commencement of this suit deliver up possession thereof to the complainant; and without costs to the complainant, except the costs of the motion to suppress the deposition of Wells. The complainant appealed from the part of the order and decree which suppressed the deposition of Hoffman with costs; the part which denied the motion to suppress Cotton's deposition with costs; and the part which denied to the complainant the costs of the suit. And the defendants appealed from all the residue of the order and decree, except that part thereof which denied their application to suppress the deposition of Wells, with costs to be paid by them.

*E. A. Graham & C. P. Kirkland,* for the complainant. I. Hoffman was a competent witness. He was not interested; or if interested, he was duly released. II. The testimony of Cotton was inadmissible. III. The plaintiffs' judgment was bona fide. It was for a just and lawful debt; and for an amount less than was then due from Hoffman & Mersereau to the plaintiffs. It was for a lawful object, viz. the security of the plaintiffs' debt. IV. The judgment was unsatisfied at the time of the sheriff's sale of the premises in question to the plaintiffs. There is no pretence of payment except by means of the lumber mortgage. This mortgage was never accepted by the plaintiffs; no agent was ever appointed by them to receive the property or act for them in its disposition, and none of the property ever came into their possession. The mortgage being executed by Hoffman and James G. Mersereau only, conveyed no title to the property. The plaintiffs could only be responsible for such sum as they actually received on this mortgage; and there is no proof that they ever received any thing; but the contrary is proved. It was a mere collateral security. If the plaintiffs are to be deemed responsible for the whole amount of this mortgage, and bound to apply the whole of it on their debt, still there would have been a large balance due on their judgment at the time of the sheriff's sale, and therefore the validity of that sale was in no manner affected by the existence of that mortgage. V. There is no ground for

the allegation that the plaintiffs' judgment should equitably be postponed to the defendants' mortgages. There is nothing in the facts of the case to justify such a proposition. No special agreement to found such a proposition upon is set up in the answer or established by the proofs. No such ground is set up in the answer. VI. The proceedings on the part of the plaintiffs subsequent to the judgment, viz. the execution, sale and sheriff's deed to the plaintiffs, were all regular, and vested in them all the rights and title to the premises in question which any of the judgment defendants had on the day of the docketing of the judgment, viz. the tenth of October, 1834; and any lien or title acquired under the judgment defendants, or any of them, subsequent to that day, is subordinate to the plaintiffs' deed. VII. Therefore, as against the mortgages to the Steuben County and Chemung Canal banks, the plaintiffs have a clear and perfect title, inasmuch as those mortgages were subsequent to the plaintiffs' judgment; and so far as the defendants rely or are driven to rely on their mortgages, they fail in showing any defence whatever. VIII. As to about 849 acres of the premises (viz. the 349 acre parcel testified to by Thorp, and the three lots marked on the plaintiffs' exhibit No. 1, as lots Nos. 17, 18, 19,) the defendants (the two banks) show no claim or title whatever except through and under the mortgages executed to them by Hoffman and John G. and James G. Mersereau. As to these 849 acres the plaintiffs' right is therefore clear on this ground. But they also establish their title to these 849 acres, on grounds mentioned in the next point. IX. As to the remainder of the premises (as to which the defendants, the Steuben County Bank, set up title under their deed from Budd and wife) the plaintiffs have a perfect legal title; and the Steuben County Bank obtained no title by the Budd deed. The warranty deed from Joshua Mersereau, jun. to John Garretson and others in February, 1818, vested in said Garretson and others all the title which Joshua then had, or which he subsequently acquired by the conveyance to him by Lindsley. The warranty operated to vest the title by estoppel. The covenants in this deed of Joshua were in full force at the time

Lindsley conveyed to him, and were never released or discharged. His grantees acted on the strength and faith of the title thus vested in them, and they in no manner parted with or lost it, till they conveyed to John G. Mersereau. The title thus vested in John Garretson and others was conveyed by them to John G. Mersereau by their deed to him of 1831, and was vested in the plaintiffs by the sheriff's sale and conveyance to them. Consequently no title was acquired by Jane Maria, by descent from her father, on his death in 1821, and no title was vested in the Steuben County Bank by her deed to them. The question between the plaintiffs and defendants here is one of mere legal preference, and if the defendants have failed in showing title under the Budd deed they fail in establishing any defence to the plaintiffs' bill. None of the facts or circumstances set up or proved by the defendants with the intent to show equitable rights on the part of Mrs. Budd can avail them. They must, so far as they repose themselves on the Budd deed, stand or fall by their legal title. No objection to jurisdiction has been set up by the defendants; and they cannot now say that the plaintiffs had a remedy at law.

X. But if the defendants obtained the naked legal title under the Budd deed, they will not in equity be permitted to set it up against the plaintiffs under the facts and circumstances here proved. John Garretson and others, the grantees in Joshua's deed of February, 1818, assumed to act, and did act as owners of the fee. As such they conveyed to John G., expressly stating in their deed to him that the premises are the same conveyed to them by Joshua. John G., after this conveyance, claimed and acted in all respects as owner of the fee, and so held himself out. Assuming the naked fee still to have been in Joshua or his heirs at law, John G. at all times had in his hands the full means and power to perfect the formal, legal title in himself; and *quoad* all the parties in this suit is to be deemed to have done so. He dealt with the plaintiffs and all the world as owner of the fee; and in reliance on this, the debt to the plaintiffs was contracted. The defendants admitted and assert the fee to be in him; they (the Chemung Canal Bank)

expressly assert it in their bill filed against the plaintiffs; and both the banks take their mortgages from the parties as owners of the fee, and expressly state in the mortgages the premises to be the same conveyed to John G. by John Garretson and others. They are thus estopped from denying this title. After all this, and with full knowledge of the plaintiffs' right, the defendants obtain the deed from Mrs. Budd. They obtain it for a consideration merely nominal, and part with nothing to obtain it; and if their statements are true, they practised a gross fraud on Mrs. Budd in obtaining it. Both parties having treated and dealt with John G. as the owner of the fee, and contracted their debts and obtained their securities accordingly, and the plaintiffs having by fair and due legal means obtained the preference, the defendants ought not to be permitted to destroy this preference by hunting up and purchasing the mere formal, legal title, for a nominal consideration ; and all this with full knowledge of the plaintiffs' position. In truth, the real and substantial claim of the defendants is under their mortgages; and by these should the rights of the parties be determined; and the defendants should not be permitted to abandon these and to convert the mere form and shadow of the Budd title into a substantial ground of claim. At all events the defendants will not be permitted to set up title under the Budd deed without paying to the plaintiffs (who represent all John G.'s title and interest in the premises,) all the incumbrances which were held by John G. against Joshua.

XI. The defendants obtained no title by the comptroller's deed. The deed was invalid on its face. The premises were in actual occupancy at the time it was given, and at the time it was due. The possession of the defendants, the grantees in this deed, (assuming them to have been in possession,) would prevent the title from passing, as against the true owners.

*E. Howell & S. Stevens*, for the defendants. I. The president, directors and company of the Steuben County Bank are seised of the lands conveyed to them by Budd and wife, of a perfect estate in the same in fee simple, and the complainants

have no interest therein, legal or equitable. On the 22d day of October, 1817, Joshua Mersereau, jun. was seised in fee simple of the premises in question, by operation of the deed of the executors of Harmanus Garretson, of the 15th day of June, 1814, subject only to the incumbrance of the mortgage of the same date, to secure the payment of the consideration of $4777,50. The judgment in favor of William Smith against him, docketed on the said 22d day of October, 1817, became a lien upon the premises subject to the incumbrance of that mortgage. The deeds of Joshua Mersereau, jun. and his wife of the 9th day of February, 1818, and the 28th day of the same month, to the executors of Garretson, conveyed to them his estate in the premises, charged with all liens and incumbrances existing upon it at the time in favor of other persons; and the mortgage of the 15th day of June, 1814, being merged in the fee, and also actually satisfied and discharged, the judgment of Smith remained a valid lien. (*Burnet* v. *Deniston,* 5 *John. Ch. Rep.* 35. *Mills* v. *Comstock, Id.* 214.) The sale of the premises by the sheriff of the county of Steuben to Eleazer Lindsley, on the 28th of February, 1818, by virtue of the execution issued on the judgment in favor of Smith against Joshua Mersereau, jun. and his deed upon the said sale, were valid and sufficient to convey all the estate and interest of Mersereau in the premises at the time of the docketing of that judgment, and the mortgage of the 15th day of June, 1814, being satisfied and discharged, Lindsley became seised of a perfect estate in the premises. By operation of the judgment, execution, sale and conveyance under it to Lindsley, the whole estate of Joshua Mersereau, jun. in the lands in question, and that of the executors derived from him, was divested, and their interest under the deed was turned into a mere personal claim or right of action against him, upon the covenants of seisin, warranty and against incumbrances therein contained. And as those covenants were broken by the incumbrance of the judgment in favor of Smith and the sale under it, attornment of Joshua Mersereau, jun. and his possession as the agent of Lindsley, it was competent for the executors to waive the right of action

upon those covenants or altogether discharge them by parol, and receive a new security or other equivalent for their damages sustained by such breach. (*Delacroix* v. *Bulkley*, 13 *Wend.* 71.) And even if the covenants had not been broken, the executors could discharge them by an executed parol agreement. (*Dearborn* v. *Cross*, 7 *Cowen*, 48.) There may be a parol waiver even of a written agreement (and therefore of a covenant) in equity; (*Bottsford* v. *Burr*, 2 *John. Ch. Rep.* 416;) and the agreement made by Garretson with Joshua Mersereau, jun. and the acceptance of the performance by him and the receipt of the consideration, and the subsequent use and appropriation of it by John Garretson and his co-executors, and particularly by the final sale and assignment to John G. Mersereau of the bonds and mortgages given and assigned by Joshua Mersereau, jun. in performance of that agreement, are full evidence of a waiver by the executors of the performance of the covenants contained in the deed of Joshua Mersereau, jun. to them. At law, or in equity, accord and satisfaction is a good bar to an action of covenant; (1 *Com. Dig.* 130, *Accord and Satisfaction*, *A.* 1;) and the agreement between John Garretson, Joshua Mersereau, jun. and Eleazer Lindsley, and the performance by Lindsley and Mersereau, and acceptance and appropriation by all the executors, of the securities given and transferred by Mersereau to them, were sufficient to satisfy and discharge those covenants. (*Strang* v. *Holmes*, 7 *Cowen*, 224.) By the will of Harmanus Garretson directing the lands in question to be sold and converted into money, and the proceeds distributed amongst his children, and that purpose existing and continuing at the time of the arrangement and settlement between John Garretson, Joshua Mersereau, jun. and Eleazer Lindsley, a court of equity is bound to regard that land as property, of the species into which it was by the will directed to be converted, so long as the purpose and object of the testator exist and for the purpose declared, to regard it as money; and the proceeds of that land, when sold, goes to the executors as personal assets, subject to the same rules as apply to other personal assets in their hands. (*Bogert* v. *Hertell*, 4 *Hill's Rep.*

492. *Craig* v. *Leslie,* 3 *Wheat. Rep.* 563. 4 *Cond. Rep. U. S. Sup. Court,* 335. *Kane and wife* v. *Gott,* 24 *Wend.* 641.) A bond and mortgage taken by executors to secure the payment of the consideration upon a sale under such a power, is assets in the hands of the executors, subject to the same disposition and control by them as other assets are, and the sale and assignment of such bond and mortgage by one executor without the consent of his co-executors is valid to transfer the same to the purchaser and bind all the parties in interest. *Bogert* v. *Hertell,* 4 *Hill,* 503.) By the sale and conveyance of the lands by the executors to Joshua Mersereau, jun. the power created by the will was well executed ; (*Saunders* v. *Saunders,* 2 *Litt. Rep.* 315 ;) and the conveyance by Joshua Mersereau, jun. to them being defeated by the incumbrance, the only proceeds or avails of the sale remaining, were the damages recoverable upon the covenants in the last deed. And those damages, when recovered, would be assets in the hands of the executors in the same manner as if they had been received in direct payment for the land, or upon a bond and mortgage or other security taken for the payment of such consideration ; and until they were recovered and collected remained a mere debt in the hands of the executors, subject to be sold, transferred, received, compounded or discharged by them or either of them, and the act of John Garretson in compounding or discharging those covenants, was valid and binding upon his co-executors. (*Bogert* v. *Hertell,* 4 *Hill's Rep.* 503. 2 *Will. on Ex.* 683, 684. 1 *Shep. Touch.* 484, 497. *Wheeler* v. *Wheeler,* 9 *Cowen,* 34.) The admissions and declarations of one of several executors, are evidence of the existence or discharge of a debt; and the written disclaimer of John Garretson is proof that all the claims of the executors upon the lands in question, except the mortgage of the 16th of December, 1819, had been discharged, and is binding upon all claiming under Garretson. (2 *Will. on Ex.* 683, *and the authorities there cited.* *Jackson* v. *Myerss,* 11 *Wend.* 537. *Van Rensselaer* v. *Aikin,* 22 *Id.* 549. *Beach* v. *Wise,* 1 *Hill,* 612.) And so of the admissions and declarations of John G. Mersereau, under whom the com-

plainants claim. (*Vide authorities last cited.*) If the acts of John Garretson in the settlement of the claims of the executors against Joshua Mersereau, jun. were not originally valid or binding upon his executors, they were made so by their subsequent adoption and ratification of the agreement then made by him, and the acceptance and appropriation made by them of the consideration paid, and securities given and transferred by Joshua Mersereau, jun. to them in performance of that agreement, upon the ground that a party who avails himself of the benefit of a contract, will be bound by it, and this even in case of an infant. (*Van Rensselaer and others* v. *Aikin and others*, 22 *Wend.* 549. *Nelson* v. *Carrington*, 4 *Munf.* 332, 340. *Overbach* v. *Heermance, Hop. Rep.* 337. 2 *Kent's Com.* 240, *and the authorities there cited. Munro and others* v. *Allaire*, 2 *Caines' Cas. in Er.* 194. *Delafield* v. *State of Illinois*, 26 *Wend.* 226. *Lawrence* v. *Taylor*, 5 *Hill*, 107.) The covenants in the deed from Joshua Mersereau, jun. being satisfied and discharged before the lands were conveyed by Lindsley to him, were to all legal intendment expunged from it, leaving only the clauses of bargain, sale and transfer of the title as in a quit claim deed; and the title subsequently acquired by Joshua Mersereau, jun. did not enure to the benefit of the executors. *Jackson, ex. dem. McCrackin,* v. *Wright*, 14 *John. Rep.* 193. *Jackson* v. *Peck*, 4 *Wend.* 300.) By the acceptance of the mortgage of the 16th of December, 1819, the executors admitted the title of Joshua Mersereau, jun. in the premises, and by their subsequent entry expressly under that mortgage reiterated that admission. And in an action of ejectment to recover the possession after payment of the mortgage, they and all claiming under them would be estopped from setting up title in themselves at the time of the execution of the mortgage, so far as the mere right of possession was in question. (*Osterhout* v. *Shoemaker*, 3 *Hill*, 513. *Jackson* v. *Myerss*, 11 *Wend.* 537. *Hunter* v. *Trustees of Sandy Hill*, 6 *Hill*, 407. *Northrop* v. *Wright*, 24 *Wend.* 227.) By the agreement between John Garretson, Joshua Mersereau, jun. and Eleazer Lindsley, and the performance on their part by Lindsley & Mersereau, and

the acceptance by Garretson and subsequent acquiescence by the other executors, they were bound to do all things necessary to carry the spirit of that agreement into effect, and if the disclaimer executed by Garretson was not valid, and a release from the executors to Mersereau was necessary for that purpose, a court of equity will presume it to have been done : for that court, regarding the substance and not the mere form of agreements and other instruments, considers things directed or agreed to be done, as having been actually performed, where nothing has intervened which ought to prevent a performance. (*Craig* v. *Leslie,* 3 *Wheat.* 563. 4 *Cond. Rep. U. S. Sup. Court,* 335.) If the executors, in the sale of the lands in question, are to be regarded as trustees and not as executors, equity will consider all things done by them, that, in pursuance of the agreement between Garretson, Lindsley, and Joshua Mersereau, jun., they ought to have done ; because their neglect to perform that agreement would prejudice the cestuis que trust, who had no other means of obtaining satisfaction of their claim against Joshua Mersereau, jun. or compensation for the land sold to him, but by the performance of that contract on the part of the trustees. And it is a rule in equity that no act of the trustee shall prejudice the cestui que trust. Nor will the forbearance of trustees in doing what it was their duty to have done, affect the cestui que trust ; since in that case it would be in the power of trustees, by delaying their duty, to affect the rights of other persons ; wherefore the rule in all such cases is, that what ought to have been done shall be considered as done. (1 *Cruise's Dig.* 525, *tit.* 12, *ch.* 4, § 9, *and cases there cited.*) The judgment in partition and the sale upon the execution and conveyance of the sheriff, vested in Lindsley a perfect estate in the 1000 acres off the south side of the tract assigned to persons unknown. (2 *R. S. 2d ed.* 247, § 36, *and.* 252, § 74.) By that proceeding the executors were concluded, as well as all other persons claiming title to those lands ; and by the deed of Lindsley to Joshua Mersereau, jun. they vested in him without being affected by his deed and the covenants therein contained ; for the reason that his title to that portion of the land was, by the

proceeding in partition, derived through the executors subsequent to his conveyance to them.   The deed of Lindsley, executed after the satisfaction of the covenants in the deed of Mersereau to the executor, vested in Joshua Mersereau, jun. a perfect estate of inheritance in fee simple in the lands in question, subject only to the incumbrance of the mortgage of the 16th of December, 1819, to secure the payment of $1700 ; and upon his death intestate, those lands descended to his daughter Jane Maria, as his only child and heiress at law.   The mortgagee holds in the character of grantee or assignee of the mortgagor when he takes possession.   He then has all the right, title and estate of the mortgagor.   Then he acquires, and the mortgagor loses, an estate liable to be sold on execution : the legal title is in him for the time being : he is liable for covenants running with the land, and the relation of landlord and tenant does not exist between the mortgagor and mortgagee in possession, so as to estop the latter from denying the title of the former.   (*Astor* v. *Hoyt*, 5 *Wend*. 617.   *Blight's Lessee* v. *Rochester*, 7 *Wheat*. 535.   5 *Cond. Rep. U. S. Sup. Court*, 339, *and the cases there cited.   Watkins* v. *Holman*, 16 *Pet.* 54, *and the cases there cited.   Osterhout* v. *Shoemaker*, 3 *Hill*, 518.   *Jackson* v. *Rowland*, 6 *Wend*. 665.)   The defendants, the Steuben County Bank, being in possession of the premises under their mortgage, had lawful right to purchase in an outstanding title to protect themselves, and may set it up against the mortgagor, and all claiming under him, and every other person.   (*Astor* v. *Hoyt*, 5 *Wend*. 617.   *Jackson* v. *Smith*, 13 *John*. 406.   *Jackson* v. *Given*, 8 *Id*. 137.   *Dale* v. *McEvens*, 2 *Cowen*, 118.   *Osterhout* v. *Shoemaker*, 3 *Hill*, 518.   *Cameron* v. *Erwin*, 5 *Id*. 272, 280.)   The estoppel even between landlord and tenant applies only to actions affecting the possession.   For the tenant after restoring the possession to his landlord may as plaintiff avail himself of any title which he has been or may be able to acquire.   (*Jackson* v. *Spear*, 7 *Wend*. 401.   *Jackson* v. *Walker*, 7 *Cowen*, 637, 644.   *Jackson* v. *Harper*, 5 *Wend*. 248.   *Woodfall's Land. & Ten. p.* 155.) In this court, the very right of the parties is in issue : and the

complainant having elected to prosecute his claim here, instead of resorting to his action of ejectment, he cannot avail himself of the estoppel, which relates only to the question of possession. A deed void for adverse possession, is only void as against the party in possession. As respects all other persons, it is effect ual to vest the title of the grantor in the grantee; and between them is conclusive, so that the grantee can maintain ejectment in the name of the grantor, and a recovery will enure to the benefit of the grantee. (*Kennedy* v. *Gardner*, 4 *Hill's Rep.* 469. *Livingston* v. *Proseus,* 2 *Id.* 526.) The deed from Budd and wife to the Steuben County Bank is valid and effectual in law to vest in them an absolute estate of inheritance in fee sim-, ple in the lands in question, subject only to the incumbrance of the mortgage of the 16th of December, 1819. (*See the author-ities above cited.*) The cestuis que trust had the whole bene-ficial interest in the lands devised, and they might elect to take the land, before conversion was actually made, or the money afterwards. The whole matter was within their control, and the conveyance by Lindsley to Joshua Mersereau, jun. by their direction and for their benefit, discharged the trust. (*Craig* v. *Leslie*, 3 *Wheat. Rep.* 563. 4 *Cond. Rep. U. S. Sup. Court,* 335. *Munro and others* v. *Allaire*, 2 *Caines' Cas. in Er.* 183, 194.) John Garretson and Dinah Mersereau, two of the three cestuis que trust in the trust created by the will of Harmanus Garretson, who were beneficially interested in three-fourths of the whole trust estate, not only allowed that arrangement, but were actually parties to the agreement between Joshua Merse-reau, jun., John Garretson and Eleazer Lindsley, by which it was effected, and are concluded by it, as are James Guyon and his wife, the remaining cestuis que trust, by their subsequent acquiescence and ratification. (*See the cases last referred to.*) II. Montgomery Hunt, the cashier of the Bank of Utica, as, such cashier was the authorized agent of the bank and their executive officer, through whom the whole monied operations of the bank, in paying or receiving debts, or in receiving, dis-charging, or transferring securities, were conducted; and as such cashier he was authorized to take security from Hoffman

The Bank of Utica *v.* Mersereau.

& Mersereau, for the payment of the debt due from them to that bank. (*Fleckner* v. *Bank of U. States*, 8 *Wheat.* 338. 5 *Cond. Rep. U. S. Sup. Court*, 458. *The Bank of Vergennes v. Warren*, 7 *Hill*, 91.) III. Hunt, in the transactions of the Bank of Utica respecting the paying or receiving of debts, or in receiving, discharging, or transferring securities, and especially in the transaction respecting the debt due to that bank from Hoffman & Mersereau, was the authorized agent of that bank, and such authority may be inferred or implied from the adoption or recognition of his acts by the bank. (*Am. Ins. Co.* v. *Oakley and others*, 9 *Paige*, 497. *Com. Bank of Buffalo* v. *Kortright*, 22 *Wend.* 363, 364, 351. *Bank of U. States* v. *Dandridge*, 12 *Wheat.* 64. 6 *Cond. U. S. Sup. Court Rep.* 445, *&c. North River Bank* v. *Aymer*, 3 *Hill*, 270.) IV. The parol agreement made by Hunt with John Magee was in relation to matters within the scope of the legitimate business of the Bank of Utica, and is to be deemed the express contract of the corporation itself. (*Safford* v. *Wykoff, Prest. &c. Bank of Seneca Co.* 4 *Hill*, 448, *per Paige, senator.* 12 *Wheat.* 64.) V. The acts, declarations and admissions of Hunt in making the agreement with Mr. Magee, and in all transactions on behalf of the bank, within the scope of the authority with which he had been really or apparently clothed, are binding upon the Bank of Utica. (*North River Bank* v. *Aymer*, 3 *Hill*, 266, 270, and cases there cited. *Bank of Monroe* v. *Field*, 2 *Id.* 445. *Welland Canal Co.* v. *Hathaway*, 8 *Wend.* 483, *per Nelson, J.*) VI. The chattel mortgage executed by Hoffman & Mersereau to the complainants, and the possession and sale of the lumber by them or their agents after the mortgage became forfeit, was a satisfaction of their debt against the firm, so far as respects the Chemung Canal and Steuben County banks, whether they received the avails or suffered their agent Hoffman to waste or divert them. (*Hertell* v. *Bogert*, 9 *Paige*, 52.) The parol agreement made between Magee on the part of the Steuben County Bank, and Hunt on behalf of the Bank of Utica, respecting the securities to be given for the debts to those banks, was a voluntary marshalling of the assets of the

common debtors, and binding upon the parties ; ( *Whelan* v. *Whelan*, 3 *Cowen*, 537, 576 ; *Rosevelt* v. *Fulton*, 2 *Id.* 129 ; *Welland Canal Co.* v. *Hathaway*, 8 *Wend.* 483 ; *Cowen & Hill's Notes to Phil. Ev. n.* 192, *p.* 200, *and cases there cited ;*) and the execution, by Hoffman & Mersereau, on the 2d day of August, 1834, of the chattel mortgage upon their lumber at Port Deposit, in pursuance of that agreement, and its accept-ance by the Bank of Utica, precluded it from resorting to the other effects of the debtors, in violation of that agreement, to the prejudice of the Steuben County and Chemung Canal banks.  The acceptance of the chattel motgage by Hunt was the act of the bank, and as conclusive upon it as if done by resolution of the board of directors. (*Fleckner* v. *U. S. Bank*, *above cited, and the authorities below.*)  The copy of the chat-tel mortgage sent to Hunt and the information of its execution sent to him, were notice to the Bank of Utica. (*Bank of U. States* v. *Davis*, 2 *Hill*, 452, 461.  *Fulton Bank* v. *Sharon Canal Co.* 4 *Paige*, 127.)  The Bank of Utica were bound to give notice of their dissent to the arrangement made by Mr. Hunt, and the making and acceptance of the chattel mortgage security in pursuance of it, within a reasonable time : and not having done so, their assent and ratification will be presumed. (4 *Kent's Com.* 615, *and the cases there cited.*)  The presump-tive evidence arising out of the facts and circumstances of the case, establishes that the complainants did assent to the ar-rangement between Hunt and Magee, under which the chattel mortgage was executed, and that they accepted and held it as security for their debt, and took possession of the property spe-cified in it, to the exclusion of all the other creditors of Hoffman & Mersereau, and appointed Chancey Hoffman their agent to keep, sell, and dispose of it for their benefit. (*Bank of United States* v. *Dandridge*, 12 *Wheat.* 64.  6 *Cond. Rep. U. S. Sup. Court*, 440, 460.  *American Ins. Co.* v. *Oakley et al.* 9 *Paige*, 497.)  The complainants were in possession of the lum-ber specified in the chattel mortgage, on the 1st day of Decem-ber, 1834, on which day it became forfeit for non-payment, and their title to the property became absolute : and being in pos-

session they were answerable for the value, and it operated as a payment, to the whole value of the lumber, which exceeded the whole amount of the debt, and entirely satisfied and discharged it. (*Patchen* v. *Pearce,* 12 *Wend.* 61. 9 *Id.* 80. 7 *Cowen,* 290. 8 *John. Rep.* 96. *Ferguson* v. *Lee,* 9 *Wend.* 258. 1 *Hill,* 173. 21 *Wend.* 473. 2 *Hill,* 127. *Case* v. *Bouton,* 11 *Wend.* 109.)

VII. The judgment of the complainants against Hoffman and Mersereau of the 10th of October, 1834, was fraudulent in fact and in law, and absolutely void. It was fraudulent in fact, because it was given for a larger sum than was due to the complainants, for the purpose of defrauding the other creditors of Hoffman & Mersereau. (*Wilder & Hastings* v. *Fondey,* 4 *Wend.* 104, *S. C.* 6 *Cowen,* 284. *Burns* v. *Morse, &c.* 6 *Paige,* 108.) It was fraudulent as against the Steuben County and Chemung Canal banks, because it was entered in violation of the agreement between Mr. Magee and Mr. Hunt, under which the chattel mortgage of the 2d of August, 1834, was given, and by which the Steuben County Bank was prevented from securing their debt against Hoffman & Mersereau, by attaching the property mortgaged. (*Whelan* v. *Whelan,* 3 *Cowen,* 537, 576. *Rosevelt* v. *Fulton,* 2 *Id.* 129. *Pike* v. *Acker,* 2 *N. Y. L. Observer,* 408.) It was fraudulent in law, because it was made and suffered with intent to hinder, delay and defraud the other creditors of Hoffman & Mersereau, and particularly the Steuben County and Chemung Canal banks, and as against them was void. (2 *R. S.* 2d ed. *p.* 72. *Wilder & Hastings* v. *Fondey,* 4 *Wend.* 104. *Burns* v. *Morse,* 6 *Paige,* 108. *Mackie* v. *Cairns,* 5 *Cowen,* 547.) The Bank of Utica is responsible for the fraud of its cashier and agent in the entering of the judgment; although the president and directors had no actual knowledge of that fraud. (*Jeffrey* v. *Bigelow,* 13 *Wend.* 518. *Sandford* v. *Handy,* 23 *Id.* 260. *Bank of U. States* v. *Davis,* 2 *Hill,* 461.) The complainants had notice of the purpose for which the judgment was entered ; for it must be taken for granted that the principal knows whatever the agent knows. (*Jeffrey* v. *Bigelow* 13 *Wend.* 518.

*Astor* v. *Wells,* 4 *Wheat.* 466. 4 *Cond. Rep. U. S. Sup. Court,* 513. *Bank of U. States* v. *Davis,* 2 *Hill,* 461. *Fonblanque's Equity,* 420, 518.) The complainants had other security for their debt by means of the chattel mortgage upon the lumber; and their motive in entering up the judgment is open to impeachment. (*Wilder & Hastings* v. *Fondey,* 4 *Wend.* 100.) The judgment was entered with the intent to hinder, delay and defraud the Steuben County and Chemung Canal banks, and is void as to them; even if the debt for which it was entered was actually due to the complainants. (*Beals* v. *Gurnsey,* 8 *John. Rep.* 446. 4 *Wend.* 104, 2 *R. S.* 72, 2d ed. 6 *Paige,* 108. 5 *Cowen,* 547.) VIII. If the judgment of the complainants of the 10th of October, 1834, is valid, they had two funds or securities to which they might have resorted for satisfaction of their debt. The Steuben County and Chemung Canal banks, by their mortgages upon the real estate, could reach that fund, but had no lien upon the lumber specified in the chattel mortgage, and could reach only one of the two funds to which the complainants could resort. The agreement or arrangement between Mr. Magee and Mr. Hunt, and the letter of the former to the latter informing him of the arrangement respecting the securities, entered into between him and Hoffman & Mersereau, and the execution of the chattel mortgage by them, and its transmission to and receipt by Mr. Hunt, were sufficient notice of the subsequent liens of the other two banks. Therefore the complainants were bound primarily to resort to that fund for the satisfaction of their debt, over which they had exclusive control. (*Fonblanque's Equity,* 4th Am. ed. 515, note (I.) b. 3, ch. 2, § 6. *Reynolds* v. *Tooker,* 18 *Wend.* 591, 593. *Evertson* v. *Booth,* 19 *John.* 492. *Hays* v. *Ward,* 4 *John. Ch. Rep.* 132. *York & Jersey Steamboat Co.* v. *Associates of Jersey Co.,* 1 *Hopkins,* 469.) The complainants are chargeable with the value of the mortgaged lumber in favor of the other creditors, if they have sold it and received the proceeds, or suffered their agents to waste it, or permitted the mortgagors to convert it to their own use after their right became absolute by the forfeiture of the mortgage, and the property was

within their power. (*Bogert* v. *Hertell,* 9 *Paige,* 59, *&c.*)
The complainants were bound in equity and good conscience
to use reasonable diligence to collect their debt by means of the
chattel mortgage, before resorting to the land under their judg-
ment. (*Bogert* v. *Hertell, supra.*) Before resorting to the
land the complainants were bound to offer to the Steuben
County and Chemung Canal banks, the benefit of the chattel
mortgage. IX. The deed of the comptroller conveyed to the
Steuben County Bank the 800 acres sold for taxes; and unless
there was an occupant at the time of the conveyance they ac-
quired a perfect title to that parcel of land. (1 *R. S.* 2*d ed. p.*
399, § 80, *and* 400, § 84.) The Steuben County Bank were
by their tenants the occupants of the premises, if any there was,
at the time of the conveyance, and were not bound to serve
notice upon themselves. The lands sold were not in the actual
occupancy of any person, but were wild uncultivated portions
of a large tract. The occupation of Hoffman did not extend
to the tax lands, but was limited to the two lots upon which he
resided as tenant to Wambaugh. The complainants had no
right whatever to redeem the tax lands after the expiration of
two years from the sale in 1830. (1 *R. S.* 399.) X. The
complainants acquired, by the purchase at the sale under their
judgment of the 10th of October, 1834, only the estate of John
G. Mersereau in the premises, which was only the possession
of an assignee of a mortgagee. ( *Wilson* v. *Troup,* 2 *Cowen,*
195. *Bogert* v. *Perry,* 1 *John. Ch.* 52; *S. C. in Error,* 17
*John. Rep.* 352. *Jackson* v. *Bronson,* 19 *Id.* 325. *Phyfe* v.
*Riley,* 15 *Wend.* 248. *Edwards* v. *Farmers' Fire Ins. Co.*
21 *Wend.* 467, 491. *Runyon* v. *Mersereau,* 11 *John. Rep.*
534. 4 *Kent's Com.* 159, 160.) John G. Mersereau purchased
of the executors only their interest in the premises, with a full
knowledge that the whole estate claimed by them was that of
mortgagees in possession. The declarations of John Garretson
respecting the title, estate and entry of the executors, after the
death of Joshua Mersereau, jun. are binding upon him and all
claiming under him. ( *Van Rensselaer* v. *A:kin,* 22 *Wend.* 549,
*and cases there cited. Jackson* v. *Myerss,* 11 *Id.* 537. *Cowen*

& *Hills' Notes to Phil. Ev.* 651. *Corbin* v. *Jackson,* 14 *Wend.* 619.) XI. The mortgage of Joshua Mersereau, jun. to the executors of Harmanus Garretson, assigned to John G. Mersereau, remained in his hands a valid lien and incumbrance upon the lands described therein, and by his assignment passed to the Steuben County Bank, and now is a valid, subsisting lien and incumbrance not in any wise merged, satisfied or discharged. (*James* v. *Morey,* 2 *Cowen,* 246.) The President, Directors and Company of the Steuben County Bank are bona fide purchasers of Thomas R. Budd and his wife, and as to them the judgments held by John G. Mersereau had ceased to be a lien upon the premises, and they ought not to be decreed to hold them subject to the lien of those judgments or the mortgage of the 16th of December, 1819, or any of them. (*Littell* v. *Hervey,* 9 *Wend.* 157. *Beals* v. *Gurnsey,* 8 *John. Rep.* 446.)

THE CHANCELLOR. At the time of docketing of the judgment of the Bank of Utica against Hoffman and John G. and James G. Mersereau, in October, 1834, the judgment debtors, or some of them, were in possession of the whole of the premises in controversy in this cause, claiming that John G. Mersereau was the legal owner thereof, under the conveyance of January, 1831. And that possession was continued until it was surrendered to the two defendant banks, as subsequent mortgagees of the judgment debtors, in July, 1836; after the execution of the complainant was in the hands of the sheriff and had been levied upon the premises. If this judgment, therefore, is valid, and had this been a mere possessory action, to recover such possession for the complainant, without the necessity of settling the legal ownership of the fee of the premises, there would be no difficulty in disposing of the case, upon the ordinary principles which are applicable in possessory actions. And the defendant banks, without showing a superior right in themselves acquired subsequently to their entry as mortgagees merely, would not be permitted to hold the possession against the complainant. For where a party enters into the possession of lands claiming under a particular title, he cannot set up an outstanding title in a stranger, as a defence

to a suit by the owner of the title under which he entered, to recover the possession of the premises. (*Jackson* v. *Stewart*, 6 *John. Rep.* 34. *Jackson* v. *De Witt*, 7 *Idem*, 157. *Hart's Lessee* v. *Johnson*, 6 *Ohio Rep.* 89. *Norwood* v. *Manow*. 4 *Dev. & Bat. Law Rep.* 449.) But a party who has gone into possession of land as the tenant of another, and acknowledging his title, is only estopped from denying the validity of that title, and setting up a better right in himself, so long as he retains the possession; or during the continuance of the tenancy. For upon the termination of the lease and the restoration of the possession, he may sue and recover back the possession of the premises, upon showing a better title in himself. (*Lessee of Galloway* v. *Ogle*, 2 *Binn. Rep.* 471. *Weatherby* v. *Wilson*, 1 *Nott & McCord's Rep.* 374. *Jackson* v. *Walker*, 7 *Cowen's Rep.* 644. *Jackson* v. *McLeod*, 12 *John. Rep.* 183. *Camp* v. *Camp*, 5 *Conn. Rep.* 301.) In the case under consideration, the vice chancellor has not only decreed the delivery of the possession of the premises to the complainant, so as to put the Bank of Utica in a situation properly to contest the alleged title which the Steuben County Bank claimed under the deed of Budd and, wife, and under the comptroller's deed, for certain portions of the premises in controversy, but has absolutely prevented the defendants from setting up that title hereafter, in any form of proceeding. It becomes necessary, therefore, to examine the question whether the legal title to a part of the premises, or rather the equity of redemption in that part thereof which was embraced in the $1700 mortgage to the executors of Garretson, was outstanding in Mrs. Budd, as the sole heiress of her father, at the time of the conveyance from Budd and his wife to the Steuben County Bank, in September, 1837; and also the question whether any title to the 800 acres, specified in the comptroller's deed, passed to that bank by virtue of such deed. The first of these questions I will now proceed to consider.

By the common law, if a grantor, who had no interest, or only a defeasable interest, in the premises granted, conveyed the premises with warranty, and afterwards obtained an absolute title to the property, such title immediately became vested in the gran-

tee or his heirs or assigns, by estoppel. (*Cov. Coke Litt.* 265, *a.*) And if the grantor, or any one claiming title from him subsequent to such grant sought to recover the premises by virtue of such after acquired title, the original grantee, or his heirs or assigns, by virtue of the warranty which ran with the title to the land, might plead such warranty, by way of rebutter, or estoppel, as an absolute bar to the claim. (*Cov. Co. Litt.* 365, *a. Terms De La Ley, tit. Guaranty. Toml. L. D. art. Rebutter.*) This principle has been applied to all suits brought by persons bound by the warranty, or estoppel, against the grantee or his heirs and assigns. So as to give the grantee, and those claiming under him, the same right to the premises as if the subsequently acquired title, or interest therein, had been actually vested in the grantor at the time of the original conveyance from him with warranty; where the covenant of warranty was in full force at the time when such subsequent title was acquired by the grantor. (*Jackson* v. *Wright*, 14 *John. Rep.* 193. *Brown* v. *McCormick*, 6 *Watts*, 64. *Comstock* v. *Smith*, 13 *Pick.* 119.) And where an estoppel runs with the land it operates upon the title, so as actually to alter the interest in it, in the hands of the heirs or assigns of the person bound by the estoppel as well as in the hands of such person himself. Thus, if a man by deed indented make a lease of land, reserving rent, which implies a warranty on the part of the lessor, and the landlord has no interest in the land at the time of the execution of the lease, if he afterwards purchases the land, and then sells it to a stranger, the latter will hold it subject to the lease; and coming in as the assignee, or grantee, of the person who made the lease, will be estopped from showing that the lessor had no interest in the land at the time he made such lease. (1 *Coke Litt.* 19 *Lond. ed.* 47, *note* 11. 7 *Bac. Abr., Warranty L. Bull* v. *Wiott*, 1 *Roll's Abr.* 868. *Somes* v. *Skinner*, 3 *Pick. Rep.* 52. *Trevian* v. *Lawrence*, 6 *Mod. Rep.* 258.) For as a covenant of warranty runs with the lands, so as to give the heirs and assigns of the grantee the benefit of the estoppel as against the warrantor, it runs with the subsequently acquired interest of the warrantor, in the hands of the heirs and assigns

The Bank of Utica v. Mersereau.

of the latter; so as to bind .that interest, by the estoppel, as against any person claiming the same under him, *in the post.* (*Fairbanks* v. *Williamson,* 7 *Greenl. Rep.* 96. *Somes* v. *Skinner,* 3 *Pick. Rep.* 52. *Stow* v. *Wyse,* 7 *Conn. Rep.* 214. *Lunsford* v. *Alexander,* 4 *Dev. & Batt. Rep.* 42. *Jackson* v. *Parkhurst & Gurney,* 9 *Wend. Rep.* 209.) Judge Lane, in delivering the opinion of the supreme court of Ohio, in the case of *Douglass* v. *Scott,* (5 *Ohio Rep.* 198,) very correctly says, that the obligation created by an estoppel not only binds the party making it, but all persons privy to him ; the legal representatives of the party, those who stand in his situation by act of law, and all who take his estate by contract, stand in his stead, and are subjected to all the consequences which accrue to him. It adheres to the land, and is transmitted with the estate. And in *Phelps* v. *Blount,* (2 *Dev. Law Rep.* 177,) the supreme court of North Carolina held that where land was vacant and uncultivated, the party entitled by estoppel was in the constructive possession of the land ; so as to maintain an action of trespass against a person who went upon the land and cut timber, claiming to do so by virtue of a pretended title in, and permission from, the person estopped. (*See also Sikes* v. *Basnight,* 2 *Dev. & Batt. Law Rep.* 157.)

Let us apply these principles to the case under consideration : Previous to the conveyance of Lindsley and wife, of the 15th of December, 1819, Joshua Mersereau, jun. the grantee in that conveyance, had conveyed to the three individuals who were the executors of H. Garretson the same premises, in connection with other lands excepted in the deed of Lindsley and wife; with full covenants of warranty, as well as of seisin. And if nothing then had occurred to prevent the covenants of warranty in the deed to the executors from operating by estoppel, upon the title conveyed to Joshua Mersereau, jun. by Lindsley and wife, that title immediately became vested in J. Garretson, J. Guyon and P. I. Van Pelt; so as to vest the absolute fee in them, by estoppel, not only as against Joshua Mersereau, jun. and his daughter and heiress, but also as against the Seneca County Bank, to whom the daughter and her husband subse-

quently conveyed. And two of the grantees in the deed, of Joshua Mersereau, jun., of the 9th of February, 1818, which had created the estoppel, having subsequently conveyed all their interest in the premises to John G. Mersereau, whose right to the premises was sold under the judgment of October, 1834, the complainant unquestionably obtained the legal title to two thirds of the premises, by the sheriff's deed; even if the title to the other third of the premises is still outstanding in the heirs or devisees of J. Guyon, who appears to have been dead at the time of the conveyance to John G. Mersereau, in 1831.

Although the grantees in the deed of February, 1818, which created the estoppel, are described as executors, there is nothing in that deed to show that the estate was intended to be granted to them as trustees; so as to create a joint tenancy which would belong to the survivors. The estoppel, therefore, vested the legal title to the premises in the three grantees named in that deed, as tenants in common; under the provisions of the act of February, 1786, directing the mode of conveyances to joint tenants. (1 *R. L. of* 1813, *p.* 54, § 6.) The executor of J. Guyon joined in the conveyance to John G. Mersereau, in January, 1831; and was probably either the devisee, or had power under the will of J. Guyon to transfer the interest of the latter in the premises as tenant in common with the other grantors in that deed. If so, the title to that third of the premises stands upon the same footing as the other two thirds. It however was not material for the complainant to establish that fact in the present case. For it is not pretended that either of the defendants has obtained the title of J. Guyon to that undivided third of the premises, by any conveyance from his heirs or devisees, unless they obtained it through the conveyance to John G. Mersereau in 1831. And as all the other defendants went into possession claiming title to the premises under that conveyance, they cannot set up an outstanding title in a stranger, to defeat a party who claims the premises under the same title as themselves; but by a prior right which c erreaches their claim. (*Ives* v. *Sawyer*, 4 *Dev. & Bat. Rep.* 51.) The case might have been different, as to this undivided third of the

The Bank of Utica *v.* Mersereau.

premises, if the defendants had shown that they had acquired the title to the same from the heirs or devisees of J. Guyon subsequent to the sale of the interest of Hoffman & Mersereau upon the execution in favor of the complainant. So far as the mere possession of the land is concerned, the two defendant banks, having entered into possession under the defendants in the judgment, subsequent to the issuing of the execution, must yield up the possession to the complainant, unless they can show a better right in themselves, or establish the fact that the judgment was invalid, as against them. (*Colvin* v. *Baker*, 2 *Barb. S. C. Rep.* 206.) And if they were found to relinquish the possession to the complainant, and had no legal or equitable interest in the premises themselves which could be the proper subject of a future litigation, or be affected by the decree in this suit, they cannot complain that the court has erroneously decreed that the complainants are entitled to the whole estate, as well as to the right of possession, of that undivided third of the premises.

It is insisted, however, that the covenants in the deed of the 9th of February, 1818, had been broken at the time of the conveyance from Lindsley and wife to Joshua Mersereau, jun. in December, 1819; and that the arrangement between J. Garretson and the grantee in that conveyance, and the written disclaimer of Garretson, were a satisfaction of the damages which he and his associates had sustained in consequence of the breach of the covenants in the deed of 1818; and thereby prevented the title acquired under the deed of Lindsley and wife from vesting in the grantees in the deed which had created the estoppel. Where the breach of the covenant of seisin affects the whole title, so that nothing passes to the grantees in the deed, a recovery by the grantees for the damage sustained by the breach of that covenant, might have the effect to prevent the operation of the estoppel created by such covenant, or even by the covenants of warranty; by creating a counter estoppel, which would prevent the grantees, or those claiming under them, from alleging that they acquired any interest in the land by the original conveyance to them. (*Stinson* v. *Sumner*, 9

*Mass. Rep.* 143. *Porter* v. *Hill, Idem,* 336.) But as the covenant of seisin does not run with the land, in this state, it is at least doubtful whether a release of the covenant of seisin by the original grantee, would prevent a subsequent conveyance, by him, from carrying to the grantee in such subsequent conveyance the general covenants of warranty, which run with the land. And if it would not, the Steuben County Bank as the grantee of Mrs. Budd, would be estopped, by the covenant of warranty of her father, in his deed of the 9th of February, 1818, from alleging that the grantees did not obtain an absolute and indefeasible title to the premises, by virtue of that deed; which title the complainants in this case have subsequently acquired, in at least two-thirds of the premises, by the conveyance to John G. Mersereau, and the subsequent sale upon the judgment and execution against him and his copartners. For although the grantee in a deed, which contains a covenant of seisin, in connection with general covenants of warranty, and the heirs and assigns of such grantee, are not estopped by such deed from showing that the grantor had no title to the land attempted to be conveyed, the warrantor, and those claiming under him, *in the post,* are estopped, by his covenants, from alleging that he had not a perfect title to the land when he conveyed the same with warranty. And therefore a reconveyance of the land, by the grantee thereof, without covenants of warranty in such reconveyance, will not prevent such original grantee from recovering for a breach of the covenant of seisin contained in the conveyance of the premises to him. (*Bennett* v. *Irwin,* 3 *John. Rep.* 363. *See also Porter* v. *Hill,* 9 *Mass. Rep.* 336.)

The covenants of warranty in a deed are not broken until eviction. And in this case there had been no eviction of the grantees of Joshua Mersereau, jun. at the time of the conveyance to him by Lindsley and wife. I see nothing, therefore, which could prevent the operation of the estoppel, by the general covenants of warranty in Mersereau's prior deed to Garretson, Guyon and Van Pelt; so as to vest in them the title, which had been actually divested by the sheriff's sale. And the cer-

tificate in writing of John Garretson, not under seal, which was made subsequent to the deed of Lindsley and wife, could not operate as a counter estoppel, even as to Garretson's one-third of the premises. So far as it had been acted upon by subsequent purchasers, from Joshua Mersereau, jun. who were ignorant of the true state of the title, a court of equity would unquestionably have restrained J. Garretson from setting up the title by estoppel, to their prejudice.

Joshua Mersereau, jun. also had rendered himself personally liable for the payment of the $1700 secured by his bond and mortgage of the same date, upon an agreement between him and Garretson and the other mortgagees for whom Garretson acted, that Mersereau should receive a conveyance of their legal title to the premises. Or what is more probable, both parties were ignorant of the law relative to the passing of the legal title to land by estoppel; and the giving of the $1700 bond and mortgage of Mersereau, and the assignment of the mortgages executed by other grantees of the premises were intended to be in satisfaction of the claim of the grantees in the deed of February, 1818, for the supposed loss of the land, by the sheriff's deeds, and the subsequent conveyance of Lindsley and wife to Joshua Mersereau, jun. Upon the first supposition, a court of equity would have compelled a specific performance, by requiring Garretson, Guyon and Van Pelt to convey the legal title, upon the payment of the $1700 and interest secured by the mortgage. But upon the supposition that both parties had acted under a mistake, in supposing that the grantees in the deed of February, 1818, had lost their title to the land, and that such title was actually in Mersereau by the force and effect of the deed of Lindsley and wife to him, a court of equity would have directed the $1700 bond and mortgage to be delivered up and cancelled, as having been obtained without consideration. Or rather, the bond should be delivered up and cancelled, for the legal title being already in the mortgagees, by estoppel, the mortgage was a mere nullity, as a security upon the land for the payment of the $1700. And the assignment of that bond and mortgage to John G. Mersereau, simultane-

ously with the conveyance to him of the legal title to the land itself, could not alter the nature of his estate in the land. Nor was the mortgage in his hands any incumbrance upon the legal title, which was in him at the time of the docketing of the judgment of the complainant.

The conclusion at which I have arrived upon this part of the case, therefore, is that Joshua Mersereau, jun. had no legal estate or interest in any part of the premises at the time of his death; and that if the judgment of the complainant was not fraudulent as against the other creditors of Hoffman & Mersereau, the proper remedy of the complainant was by a suit at law to recover the possession of the premises in controversy. And if the defendants had made a proper objection, in their answer, to the jurisdiction of this court to give relief to the complainant, upon the case made by the bill, the vice chancellor should have dismissed the bill, with costs; but without prejudice to the rights of the complainant in a suit at law. For as Joshua Mersereau, jun. had no interest in the premises in controversy, upon which his mortgage to the executors could operate as an incumbrance, or which could be affected by the outstanding judgments against him, neither the mortgage nor the judgments were such a cloud upon the title of the complainant as would authorize an application to this court for relief. But as the defendants neglected to make any such objection to the jurisdiction of the court, in their answer, and had thus compelled the vice chancellor to decide upon the legal rights of the parties, it was proper for him, in the decree, to declare the invalidity of the mortgage and judgments as liens upon the title acquired by the complainant under the sheriff's deed. For the court of chancery will not refuse to take jurisdiction of a case, and to make a proper decree therein, merely upon the ground that the complainant had a perfect remedy by an action at law; wl en the parties have submitted themselves to the jurisdiction of the chancellor, without objection. (*Ludlow* v. *Simonds*, 2 *Caines' Ca. in Error*, 56. *Hawley* v. *Cramer*, 4 *Cowen*, 727. *Gilb. Ch. Pract.* 220. *Grandin* v. *Le Roy*, 2 *Paige's Rep.* 509. *Rees* v. *Smith*, 1 *Ohio Rep.* 509.) But where the complain

ant improperly and unnecessarily comes into this court for relief, and the defendant neglects to make the objection that the remedy of the complainant, if any, was at law, whereby the chancellor is compelled to take jurisdiction of the case, and to decide it upon the merits, he may, in the exercise of a sound discretion, refuse to give to either party the general costs of the litigation here. For this reason, although the vice chancellor did not decline jurisdiction of this case, which was a mere ejectment bill to recover the possession of real estate, upon a legal title, according to the case made by the bill, I think he very properly refused to give to the complainant the general costs of the prosecution of this very expensive suit in the court of chancery.

The deed from Joshua Mersereau, jun. to Garretson, Guyon and Van Pelt, which was produced upon the hearing, merely describes them as executors of H. Garretson deceased ; but does not profess to convey the premises to them in their character of executors. And if the proceedings were different a question might arise whether the grantees in that deed did not take the title as tenants in common ; so that the conveyance from the two surviving grantees, and the executor of the deceased grantee, to John G. Mersereau conveyed only two undivided two-third parts of the premises in question. For there is no evidence in the case that the executor of J. Guyon, one of the grantees in the deed of February, 1818, was either the heir at law of the decedent, or was authorized by his will to convey his real estate. But I think the parties, by the pleadings, are precluded from raising that question in this suit. The bill alleges that the land conveyed to Joshua Mersereau, jun. by the executors as such, was *reconveyed* by him to the said executors, and that his wife also executed a quit-claim deed of the premises to the said executors, by which her interest in the premises was also vested in the said executors. These are allegations that the reconveyance of Joshua Mersereau, jun. to them, and the quit-claim of his wife to them, were to the grantees in their characters of executors. And the answer of the defendants admits this reconveyance by Joshua Mersereau, jun. to the executors, and the quit-claim of his wife to them, nearly in the same words of the allegations in the bill. These facts,

admitted by both parties in their pleadings, are to be taken as true for the purposes of this suit. And if so, the reconveyance vested the title in the executors as joint tenants, and not as tenants in common, under the provisions of the statute on that subject. (*See* 1 *Rev. Laws of* 1813, *p.* 54, § 6.) The title therefore was vested in two of the grantors in the conveyance to John G. Mersereau, as the surviving executors, by the estoppel and the death of their co-executor; and passed by the last mentioned conveyance to the grantee named therein. And the deed of February, 1818, showing a conveyance to Garretson, Guyon and Van Pelt as tenants in common, must be laid entirely out of view; as tending to establish a fact which is contrary to what both parties have alleged and admitted by their pleadings. For the purpose of the decision which I am to make, I must consider it as settled that the legal title to the whole of the premises in controversy became vested in John G. Mersereau, by the deed to him from the surviving executors, and from the executor of their deceased co-executor.

I do not agree with the vice chancellor that the comptroller's deed is void, either as to its form, or because it does not specify the year in which the taxes were laid for the non-payment of which the premises were sold. The provision in the revised statutes directing the comptroller to execute a conveyance of the property sold, *in the name of the people of the state,* is not new, but was contained in the revised laws of 1801 and of 1813. (1 *Rev. Laws of* 1801, *p.* 555. 2 *Rev. Laws of* 1813, *p.* 517.) And I believe the comptroller's deeds upon tax sales have been in the same form in this respect under all of these laws. They have so far back as I have examined, which is more than a quarter of a century. And thousands of titles now depend upon conveyances executed in the same form as the deed in this case. When we recollect, too, that deeds in this form have been executed by such men as Chief Justice Savage, Mr. Justice Marcy, and Silas Wright, who have heretofore filled the office of comptroller, and probably with the sanction of the several distinguished jurists who have from time to time occupied the station of attorney general of the state, and that many

recoveries have been had in our courts upon such deeds without objection, it is too late to pronounce such deeds invalid, upon a mere technicality, suggested for the first time by the counsel for the complainants in this suit. The maxim that custom is the best interpreter of the law is applicable to this case. (4 *Inst.* 75. 2 *Eden's Rep.* 74. *Hopk. Ch. Rep.* 267.) In the case of *McKeen* v. *Delaney's Lessee*, (5 *Cranch's Rep.* 32,) the late Chief Justice Marshall, in relation to the validity of the proof of a deed says, were the act of 1715 now for the first time to be construed, the opinion of this court would certainly be that the deed was not regularly proved, and therefore not legally recorded. But the court put its decision in favor of the validity of the recording of the deed upon received custom in the state where the deed was given; although no judicial decision had been made there upon the question. And in relation to the practical construction which had been given to the same statute, Chief Justice Tilghman says, "so extensive and deep rooted is the practice that numerous titles depend on it, and it would be unpardonable to disturb it now by a critical examination of the words of the act." (1 *Serg. & Raw. Rep.* 106.) Lord Coke's expression, (*Coke Litt.* 186 a,) that common opinion is good authority in law does not apply to a mere speculative opinion in the community as to what the law upon a particular subject is. But when such opinion has been frequently acted upon, and for a great length of time, by those whose duty it is to administer the law, and important individual rights have been acquired or are dependant upon such practical construction of the law, this expression of the learned commentator upon Littleton is entitled to great weight.

It is true the deeds which have been given by the comptroller from time to time, are not technically given in the name of the people. But they recite the substance of the statutes under which the sales have been made, the non-payment of the taxes which have been charged upon the land in pursuance of such laws, the advertisement and sale of the premises, the payment of the purchase money into the treasury of the state, by the grantee, and that the premises have not been redeemed; and

the comptroller under the official seal of the state belonging to his office, and, as the deed states, by virtue of the authority vested in him by law, conveys the lands so purchased, either to the original purchaser, or to his assigns; which deeds are witnessed by one of the officers mentioned in the statute. No one, therefore, upon examining the deed of the comptroller, executed in this form, can doubt as to the intention of the comptroller to convey the premises for and in behalf of the people of the state; although the people are not technically described as the grantors in such conveyance.

Again; if this supposed error in the form of the comptroller's deed was now material, it would not justify a court of equity in declaring that the purchaser had no right to the land by virtue of his purchase; but the comptroller, if necessary, would be required to give him a new deed, in the proper form. There is nothing in the statute requiring the deed to state in what year the tax was assessed, for the non-payment of which the premises were sold. The deed states that such taxes have been assessed and returned to the comptroller, and have remained unpaid for two years from the first of May following the year in which they were assessed; which is all that could be necessary to show, upon the face of the deed, that the comptroller was authorized to make the sale. And if the owner of the land wished to ascertain for what year the taxes were assessed, he could do so without any difficulty by referring to the books which by law are required to be kept in the comptroller's office.

The deed in question, therefore, if the lands assessed, and the part conveyed, had been so described therein as to be capable of location, would have been sufficient, prima facie, under the practical construction which has been given to the tax laws, to entitle the Steuben County Bank to the 800 acres of the premises in controversy which are claimed under that deed. This prima facie evidence of ownership, however, was liable to be rebutted, by showing that the tax returned to the comptroller as unpaid had actually been paid to the collector. (*Jackson* v. *Morse*, 18 *John. Rep.* 441.) It might also be rebutted by showing that the land thus sold and conveyed by the comp

troller, or some part of it, was actually occupied by some person at the expiration of two years from the time of the sale, or that it was so occupied at the time of the giving of the comptroller's deed; so as to throw upon the party claiming under such deed the necessity of proving that he had given, to the occupant, the notice to redeem which is required by the statutes on this subject.

There are two provisions of the statutes in relation to notices to occupants, which are applicable to all sales made subsequent to the 5th of April, 1830, for the non-payment of taxes; and which are necessary therefore to be considered in the decision of this case. The original eighty-third section of the article of the revised statutes relative to sales for unpaid taxes, and the conveyance and redemption of lands sold, (1 *R. S.* 412,) declared that whenever any land sold for taxes, and conveyed by the comptroller, should at the *time of such conveyance* be in the actual occupancy of any person, the grantee, or the person claiming under him, should serve a written notice on such occupant, stating what was necessary to redeem the land from the sale, and that unless the same was redeemed, within the time prescribed, the conveyance of the comptroller would become absolute. And the 87th section of the same article required the grantee or other person claiming under him, in cases of such occupancy, in order to complete his title to the land so conveyed, to file with the comptroller the affidavit of the service of the notice upon the occupant. These provisions of the revised statutes are still in full force; having never been repealed or abrogated. But the act of the 5th of April, 1830, made a further provision on the subject of notices to occupants of lands which should thereafter be sold for taxes, and where the occupants should be in the occupation of such lands, at the expiration *of the two years given for the redemption thereof;* that is, at the end of two years from the last day of the comptroller's sale for taxes; as provided for in the original sixty-sixth section of the article of the revised statutes before referred to. (1 *R. S.* 409.) In case the lands sold by the comptroller are occupied at the expiration of the two years, whether conveyed by the comptroller or not at that time, the act of April, 1830, required the purchaser, or

the person claiming under him, to serve the notice upon the occupant within one year from the expiration of such time of redemption; and to file the evidence thereof with the comptroller within one month after such service. And the time for redeeming the land, when thus occupied at the expiration of the two years from the time of the sale, is six months from and after the filing of the evidence of the service of such notice with the comptroller. (*Laws of* 1830, *p.* 112.)

The effect of these several statutory provisions is that if the land sold by the comptroller for taxes, or any part thereof, is actually occupied at the end of the two years from the close of the sales, the purchaser, or his assignee, must serve the notice required by the act of April, 1830, upon the occupant, and file the evidence of such service with the comptroller, within the times prescribed by that act, or by the subsequent act amending the same, (*Laws of* 1844, *p.* 397,) or he will lose the benefit of his purchase. Where he serves such notice, and files the evidence of such service upon the comptroller, within the time prescribed, if the lands are not redeemed within the six months allowed by the act of 1830 for that purpose, his title will become perfect, as soon thereafter as he shall have obtained the comptroller's deed; whether such deed shall have been given before or after the service of such notice. (*Laws of* 1830, *p.* 113, § 3. 1 *R. S.* 3*d ed.* 466, § 105.) In case however the lands sold were not occupied at the expiration of the two years from the time of sale, but there is an actual occupant of the land sold, or of any part of it, at the time of the giving of the comptroller's deed, then the original eighty-third section of the article of the revised statutes before referred to still applies. And in that case the title of the purchaser will not become absolute, under the comptroller's deed, until six month's after he shall have served the occupant with the notice to redeem specified in the eighty-fifth section; and shall have obtained the comptroller's certificate that evidence of the fact of such service has been filed, and that the land was not redeemed by the payment of the redemption money into the treasury within six months after the service of such notice.

But in cases not coming within the scope of the act of April, 1830, there is no time limited by law for giving notice to the occupant of the land who was in such occupancy thereof at the time of giving the comptroller's deed. And the only effect of a neglect to give such notice is to extend the time for redemption of the land, and the perfecting of the title of the purchaser.

In the case under consideration, therefore, if the lands assessed and sold had been properly described, and no part of the 800 acres was occupied at the expiration of the two years from the time of sale, the vice chancellor should not have deprived the Steuben County Bank of the benefit of what the owner of the land would have been required to pay to redeem the same ; but the decree should have directed that amount to be paid by the complainant, or that the Steuben County Bank should be permitted to complete its purchase of the 800 acres by giving the notice required by the provisions of the revised statutes in such cases. The fact that the 800 acres were actually occupied at the date of the comptroller's deed, in December, 1837, is fully established. For the case shows that T. L. Mersereau leased the whole of the premises in controversy from the two defendant banks, on the 4th of November preceding the giving of that deed, for the term of one year ; and he went immediately into possession under that lease. It is true, as to one half of the premises, he was the tenant of the grantee in the comptroller's deed. But that did not authorize the grantee in such deed to perfect his title as against the complainants' paramount claim upon the land, or as against the Chemung Canal Bank, without giving the notice required by the statute. This question was fully considered by the late Chief Justice Savage, in the case of *Jackson* v. *Esty*, (7 *Wend. Rep.* 148.) And the supreme court there decided that it was not necessary that the occupant of the land sold for taxes should be the owner thereof; and that an occupant who was not the owner could not waive the service of a notice on him, so as to perfect the title of the purchaser without an actual service of notice upon such occupant, and without furnishing evidence of such service to the comptroller. That decision I think was in accordance with the true construction

of the statute; which requires service of the notice to be made upon every person who is an actual occupant of the premises included in the comptroller's deed, whoever he may be, and the obtaining the comptroller's certificate, as conditions precedent to the vesting of the title of the owner of the land in the grantee in such deed, or in those claiming under him.

In this case, however, I have arrived at the conclusion that the sale by the comptroller is one which came within the provisions of the act of April, 1830; because a part of the premises at least were occupied by the Messrs. Lewis at the expiration of the two years allowed by law for the redemption of the 800 acres from the sale. And the original purchaser at the comptroller's sale, whoever he was, lost his right to perfect his title; by his neglect to serve the notice upon them within the time prescribed in that act. The pleadings and proofs show that as early as 1831, John G. Mersereau, claiming to be the owner of the premises conveyed to him by the deed of Garretson and others, contracted to sell 1000 acres off of the north end thereof to the Messrs. Lewis; that they moved on to the land, and exercised acts of ownership over the same by improving parts thereof and getting lumber from the residue of the 1000 acres, until some time in 1834. And the maps produced in evidence show that the land so occupied by the Messrs. Lewis, included nearly two-thirds of the 800 acres sold by the comptroller for taxes; even if the same should be laid out in such a form as to exclude the whole of the two Pier lots, which had been actually occupied from a much earlier period. It has been very correctly decided, by the late supreme court, that if any part of the premises sold for taxes is actually occupied at the times specified in the statutes relative to the giving of notices to the occupant, the purchaser must give the prescribed notice to the occupant of such part of the premises, and obtain the comptroller's certificate, that such notice was given and that the premises were not redeemed within the time prescribed, before he can complete his title to any part of the premises included in the sale. (*Comstock and wife* v. *Beardsley,* 15 *Wend. Rep.* 348. *Bush* v. *Davison,* 16 *Idem,* 550.)

Again; I am inclined to think the premises assessed were so described that it is impossible to locate the 800 acres, intended to be sold out of the northwest corner thereof, to be laid out in a square form as nearly as may be. The lands were assessed to John Garretson; but the quantity of land does not correspond with that embraced in the mortgage to the executors, of December, 1819; nor with that which was vested in the executors by estoppel, north of the Dinah Mersereau lot, which in the assessment is described as the land of her husband Joshua Mersereau the elder. Two of the boundaries, the south and the west, can be ascertained without any difficulty; and perhaps the east might have been ascertained by showing what lands were occupied and claimed by other persons, to the north of the Ryers lot and adjoining the river, at the time the assessment was made. But the tract assessed is bounded on the north partly by the town line and partly by Rathbone's lands. And none of the witnesses can recollect that any person by the name of Rathbone ever owned or occupied any lands in that township west of the Tioga river. The boundary intended was probably the land of some occupant who was in possession of land south and adjoining the Pier lots. But even if that fact was ascertained it would be necessary to ascertain the width, north and south, of the land assessed, as well as its extent on the east, for the purpose of locating the 800 acres. For that quantity of land laid out in a square form in the northwest corner of the township would run so far east as to include a part of the Pier lots; which were undoubtedly assessed to actual occupants, from the time of the conveyance thereof in 1819. As the lands described in the comptroller's deed could not be located, for want of a proper description of the 2401 acres, in the northwest corner of which the lands sold were to be laid out in a square form as nearly as might be, the sale was invalid. And the Steuben County Bank would not have acquired any title to any part of the premises in controversy, by virtue of the comptroller's deed, even if no part of the premises which that deed was supposed to cover had been actually occupied at the expiration of the two years from the

time of the sale, or at the time of the giving of the deed by the comptroller in December, 1837.

The most important question in this case is, whether the judgment, under which the complainant claims title to the premises in question, was fraudulent and void as against the defendant banks, as creditors of the firm of Hoffman & Mersereau. And in examining this question it is proper to ascertain, in the first place, whether the decision of the vice chancellor was right in suppressing the deposition of Hoffman, and in denying the application, made on the part of the complainant, to suppress the deposition of Cotton, one of the attorneys employed by the firm of Hoffman & Mersereau to draw the bond and warrant to be executed by them and to enter up a judgment thereon against them in favor of the complainant.

If Hoffman was an incompetent witness, the release produced at the hearing did not restore his competency, even if that release had been duly proved before the closing of the proofs in the cause. It is merely a release of his personal liability upon the judgments, in favor of the complainants, as a copartner or joint debtor with the defendants John G. and James G. Mersereau, for the consideration of one dollar; in pursuance of the provisions of the act of April, 1838, for the relief of partners and joint debtors. (*Laws of* 1838, *p.* 243.) But it leaves those judgments, and the debts for which they were recovered, in full force against his copartners. And if his copartners should hereafter be compelled to pay any part of those debts, either because the title to the land sold upon the execution on one of those judgments failed, or for any other cause, it would leave him still liable to them for his share of the debts. The effect of the release is not therefore to discharge any interest which the witness has in the event of the suit, in favor of the complainant as against the defendant banks; but merely to compel the complainant to seek redress against John G. and James G. Mersereau in the first instance, and leaving them to their remedy from the witness in case the complainant recovers any thing against them. To restore the competency of the witness, if he was in fact incompetent in consequence of any contingent

The Bank of Utica *v.* Mersereau.

liability for those debts, depending upon the event of this suit, the complainant should not only have released Hoffman but also the other members of the firm of Hoffman & Mersereau from such contingent liability.

Again ; I think this release was not properly proved so as to affect the question of the competency of the witness, even if such release amounted to any thing if properly proved. Where it only appears from the examination of the witness himself that he is interested in favor of the party calling him, or that he is otherwise incompetent, the objection to his competency may be removed in the same manner that it was created. And the witness may be examined, by the party calling him, to show that his interest has been removed by a release, or to prove any other fact to establish his competency at the time of his examination. But where his interest, or other incompetency, appears *aliunde* the witness cannot be examined for the purpose of showing his competency, by testifying to the execution of a release, or to any other fact. ( *Greenl. Ev.* 471, § 423. 13 *Mart. Louis. Rep.* 709. 4 *Serg. & Rawl.* 298. 1 *Cowen,* 540.) The testimony of Hoffman therefore should not have been received to prove the execution of the release to himself from the complainant.

Nor could ex parte affidavits of other persons be received, after the proofs in the cause had been closed, to prove that this release had been executed and delivered to Hoffman before he was examined as a witness. As the release which was produced on the hearing was neither dated nor witnessed, the acknowledgment by the party executing it was only evidence that he had executed it at or before such acknowledgment. Not that it was executed previous to the examination of Hoffman as a witness. The acknowledgment of the release, therefore, which was long subsequent to such examination, would not have aided the complainant, even if notice had been given of the intention to use the release, on the hearing, ten days before the proofs were closed ; as required by the 75th rule of the court. This release therefore must be laid entirely out of the question in deciding upon the competency of Hoffman as a witness for the complainant.

The Bank of Utica *v.* Mersereau.

But whether such release was or was not regularly proved, the vice chancellor was right in supposing that Hoffman was interested in favor of the complainant in establishing the fact that the lands in controversy belonged to John G. Mersereau, at the time of the docketing of the judgment against Hoffman & Mersereau, or to some or all of the defendants in the judgment. The lands of a judgment debtor were not liable to be sold on execution by the English common law. But by the statutes of extents and elegits, they were set off to the judgment creditor until his debt should be paid. And more than three centuries since, a statute was made there, giving a remedy to the creditor to whom the debtor's land had been delivered in extent upon elegit, where the tenant by elegit was afterwards evicted out of or from the possession of such land, without any fault on his part. (*Stat.* 22 *Hen.* 8, *ch.* 5.) As this was a part of the general law of England at the time of the first settlement of this state under the charter to the Duke of York, it became a part of the common law of the colonists, in connection with the principles of the statutes of extents and executions then existing in England. But when, in 1732, the statute of 5 George 2d, chapter 5, subjected real estate in the colonies to sale upon execution in the same manner as personal property, the writ of eligit was virtually abolished here. The equitable principle of the statute 32 Hen. 8, chapter 5, however, still applied to the case of a creditor who had purchased the real estate of his debtor upon execution. And of course, it continued to be a part of the law of the colony; though the particular form in which the relief had been given was no longer strictly applicable to the sale under an execution. For the land was frequently sold to a stranger to the judgment, and the judgment was thereby satisfied. And the courts of several of our sister states have frequently acted upon the equitable principle of the English statute on this subject, by giving relief upon an application to their equitable powers. I have no doubt therefore that it is a proper subject of equity jurisdiction here, and has been so from the time when the statute subjecting real estate in the colonies to be sold on execution became a part of the law of the colonies.

The Bank of Utica *v.* Mersereau.

In the first revision of our laws the legislature attempted to give a remedy at law, in the supreme court, to the purchaser of lands upon execution, or to his heirs or assigns, where he or they had been evicted on account of any irregularity in the proceedings, or want of title in the judgment debtor, or by reason of any prior incumbrance thereon. (*Law of* 19*th March,* 1787, § 7.  1 *Greenl. Laws,* 407.)  And the same provision, in substance, was contained in the revisions of 1801 and of 1813.  (1 *R. L. of* 1801, *p.* 391, § 10.  *Id. of* 1813, *p.* 504, § 11.)  It is doubtful, however, whether this provision applied to a case where the plaintiff in the execution was himself the purchaser.  If not, it left the law as to him precisely as it stood before; and only gave a statutory remedy to a stranger to the execution, who had become the purchaser and had been evicted, against the plaintiff, or the defendant, in the judgment and execution who ought in justice and equity to refund the purchase money to him.  Although that statutory provision was in force for more than forty years, I am not aware that it ever came before any of our courts so as to obtain a judicial construction, except incidentally in the case of *Woodcock* v. *Bennet,* (1 *Cowen,* 711.)  Nor have I been able to learn that any proceedings were ever commenced under it.  But while it was in force the case of *Lansing and others* v. *Quackenbush,* (5 *Cowen's Rep.* 38,) came before the supreme court, upon a summary application to the equitable power of that court for relief.  There one of the plaintiffs in the execution had become the purchaser, at the sheriff's sale, of lands which were represented to be the property of the defendant, but which afterwards were ascertained to belong to another person.  The court said there was clearly a remedy in the case; but refused to give relief, upon a summary application, upon the ground that the more appropriate remedy was in a court of equity.  In a subsequent case, however, where the sheriff had sold personal property which was supposed to belong to the defendants in the execution, and had applied the proceeds of the sale upon the execution, but the real owner of the property had sued him and the judgment creditor, and had recovered of them the value of the property, the su-

preme court, upon motion, in behalf of the original judgment creditor, directed the endorsement of the proceeds of the sale upon the execution to be stricken out; and allowed him to take out a new execution for the amount of his judgment. (*Adams* v. *Smith and Parmeter*, (5 *Cowen*, 280.) The same equitable principle was acted on by that court in the subsequent case of *Richardson* v. *McDoughall*, (19 *Wend. Rep.* 80.) The statutory provision contained in the revision of 1830, (1 *R. S.* 375, § 68,) clearly does not apply to the case under consideration. For that only gives an action, to the purchaser, against the plaintiff in the execution, for whose benefit the property was sold. And merely in those cases where such purchaser has been evicted in consequence of an irregularity in the proceedings concerning the sale, or in consequence of the judgment being vacated or reversed. There is indeed a remedy over against the defendant in the execution, in favor of the plaintiff therein; but it is only given to him after he has been compelled to refund the purchase money, upon the sheriff's sale, to the purchaser who has been thus evicted. Where the plaintiff in the judgment is himself the purchaser, and has been evicted for want of title in the judgment debtor, his remedy depends still upon the equitable principle of our colonial common law, derived originally from the statute of Henry the 8th as applied to sales of land upon execution; which became the substitute for an extent by elegit. This equitable principle has been applied, by analogy, to sales of personal property and chattel interests in lands, where the plaintiff became the purchaser and was subsequently deprived of the benefit of his purchase, for want of title in the judgment debtor. And where the common law did not provide for such cases they were proper subjects for the interference of the court of chancery; or for relief upon a summary application to the equitable power of the court out of which the execution issued. In the territory comprising the present states of Massachusetts, New Hampshire and Maine, where no court of equity existed, the case was provided for by the colonial law of 1674, which provided that where a party had obtained an execution and levied the same

The Bank of Utica v. Mersereau.

upon lands, houses or goods, if it afterwards appeared that such lands, houses or goods did not belong to the party against whom the judgment was rendered, the party who had thus levied his execution thereon, by mistake, upon making it appear to the court which rendered the judgment, such court should order a new execution for satisfying the judgment; notwithstanding the former execution returned. (*See opinion of Mr. Justice Woodbury, in Whiting* v. *Bradley*, 2 *New Hamp. Rep.* 85.)

In the case of *Jones* v. *Henry*, (3 *Litt. Rep.* 435,) the court of appeals in Kentucky decided that the plaintiff in the execution, who had indemnified the sheriff for selling property which it was afterwards ascertained did not belong to the judgment debtor but to another person who had recovered the value thereof in an action against the sheriff, was entitled to relief against the judgment debtor to the extent of the sum endorsed upon the execution. This decision was afterwards followed by the same court, in the case of *Price* v. *Boyd*, (1 *Dana's Rep.* 436.) A similar decision was made by the supreme court of Illinois, in the case of *Warner* v. *Helm*, (1 *Gilm. Rep.* 220.) The equitable principle before referred to and which is recognized in these decisions is applicable to the case now under consideration. For it is alleged in the bill, and admitted in the answer, that the complainant purchased the premises at the sheriff's sale, under a belief that the title was in the judgment debtors or one of them at the time of the docketing of the judgment. And this is admitted by the answer of the defendants. Indeed, in the statement of their property, furnished to the complainant and to the defendant banks in the spring of 1834, Hoffman & Mersereau represented to the complainant that they were the owners of the John Garretson lands of 4100 acres. The case therefore is like that of *Muir* v. *Craig*, (3 *Blackf. Rep.* 293;) where the supreme court of Indiana granted relief to the purchaser, against the judgment debtor who had represented the lands sold by the sheriff as belonging to him, but it was subsequently ascertained that such was not the fact. I am aware that the supreme court of Pennsylvania, in the case

of *Freeman* v. *Caldwell*, (10 *Watts' Rep.* 1,) has decided that a sale of real or personal estate to the amount of the judgment is an absolute satisfaction of the debt. And also that the plaintiff is without remedy, although it is afterwards established that the property bid off by him did not belong to the judgment debtor, and the same has been recovered of the purchaser by the real owner. But without deciding what the form of the relief should be in the present case, I have no doubt that the Bank of Utica would be entitled to relief in some form, against the judgment debtors, if a decree should be made against that bank upon the ground that none of the judgment debtors had any title to the land sold by the sheriff, either at the time of docketing the judgment or afterwards. And if so, Hoffman was an incompetent witness to prove that the defendants in the judgment, or any of them, were the owners of the real estate in controversy at the time the lien of the complainant's judgment attached, or at any time subsequent thereto and previous to the sale upon the execution. For if the complainant should fail in this suit upon the ground of a want of title in all or any of the judgment debtors, Hoffman & Mersereau would not only be liable for the payment of the amount of their bonds and mortgages to the two defendant banks, but also for the whole amount of the judgment of the complainant. But, on the other hand, if the complainant succeeded in establishing the fact that the title to the property sold under the execution was in the judgment debtors, the liability of Hoffman and his copartners to the Bank of Utica would be discharged, at least to the amount of the bid at the sheriff's sale. The whole of Hoffman's testimony in relation to the title of the judgment debtors, or any of them, to the lands in controversy, or which has any bearing upon that question, was, therefore, properly suppressed, by the vice chancellor.

I think, however, this witness was not disqualified, by interest, to give testimony in favor of the complainant to rebut the charge that the judgment w̔ fraudulent and void as against the two defendant banks. Nor was he incompetent as a witness for the complainant upon the question as to the acceptance

of the chattel mortgage by the latter, or as to the amount of lumber embraced therein, and of the proceeds thereof, and what was done with such proceeds, and the fact of his agency. And in this court, where many issues are frequently combined in one suit, a witness is not to be rejected altogether because he may be interested as to one part of the case, when as to another part of the case he has no interest whatever. But he may be examined as a witness to that part of the case in which he has no interest, or in which his interest is adverse to the party calling him. (*Gresley on Eq. Ev.* 248. 2 *Wend. Rep.* 201. *Rowe* v. *Cockrell*, 1 *Bail. Eq. Rep.* 127.)

Hoffman, so far from being interested in favor of the complainant in relation to the question of fraud in the judgment, appears to have been interested in favor of the parties against whom he was called and examined, on this point in the case. For if the title to the land was in the judgment debtors at the time of the giving of the bonds and mortgages to the two defendant banks, a decree against the claim of the complainant upon the ground that the judgment was fraudulent and void as against those mortgagees, would enable the mortgagees to obtain satisfaction of their debts by a foreclosure and sale of the mortgaged premises. But such a decree would not, as between the complainant and Hoffman & Mersereau, prevent the sale of the premises by the sheriff from operating as a satisfaction of the judgment, to the extent of the complainant's bid, and a satisfaction, *pro tanto*, of the debts included in the judgment.

In reference to the testimony of this witness in relation to the acceptance of the chattel mortgage, and to his agency under the complainant, and as to the amount of lumber covered by the mortgage, and the disposition of the proceeds of the sales thereof and the liability of his copartners for the debts of Love, Pickering & Co., Hoffman might be, and probably was, interested in the questions propounded by the counsel for the complainant. That, however, only went to his credibility. But in relation to all these matters I cannot see that he had any interest in the event of this suit. It is true if the complainant should be defeated in this suit, not upon the ground of a want

of title in the premises in controversy in the judgment debtors, nor upon the ground that the judgment was fraudulent, but upon another ground taken in the answer, that the complainant by the chattel mortgage had obtained full security for the indebtedness to the Utica Bank, and that having such security it was inequitable as against the mortgagees, to suffer that fund to be wasted, or misapplied, and to enforce their judgment against the mortgaged premises, Hoffman & Mersereau, or Hoffman alone, would be answerable to the complainant for so much of the property included in the chattel mortgage as would be equal to the amount bid at the sheriff's sale. But on the other hand the witness would receive a corresponding benefi . For by such a decree the premises in controversy would have been applied to the payment of the bonds and mortgages to the defendant banks; for the amount of which bonds and mortgages, Hoffman, as well as the other members of his firm, was liable, at the time of his examination as a witness, and would continue to be so liable if the charge of fraud in the judgment should be disproved, by his testimony, so as to enable the complainant to succeed in this cause. And whatever might be the result of the suit, Hoffman would be accountable to his copartners for their shares of all the copartnership property, disposed of by him, which was not applied for the benefit of the firm. Nor could the evidence given by him in this suit avail him any thing upon that accounting.

For these reasons the vice chancellor should not have suppressed the whole of the testimony of Hoffman; but only so much thereof as related to the title of the judgment debtors, or of John G. Mersereau, to the premises in controversy, at the time of the docketing of the judgment of the complainants. The residue of the decretal order as to the suppression of the testimony of Hoffman, including the direction as to the costs of the motion to suppress, must be reversed; without costs to either party on that motion.

The next question to be considered is whether the vice chancellor erred in refusing to suppress the deposition of H. G. Cotton as a witness for the defendants. The testimony of this

witness as to what took place, and as to what was said, upon the giving of the bond and warrant, was objected to by the counsel of the complainant, and also by Hoffman himself, who was not a party to the suit. But it was called for not only by the defendant banks, but also by John G. and James G. Mersereau, two of the members of the firm for which he was employed to draw the bond and warrant and to enter up the judgment thereon. He stated that he never was employed by the Bank of Utica, and received no communication from any of the officers of that institution on the subject of the bond and warrant or of the entering of the judgment thereon; and that, as those who employed him differed on the question, he did not know what it was his duty to do as to giving testimony on the subject. And said he preferred to state the facts and leave the question as to their admissibility as evidence, in favor of the complainant, to the decision of the court. The witness then testified, in substance, that a few days before the bond and warrant were executed, Hoffman and the Mersereaus called upon him at his office and said they wished to give a judgment to the Bank of Utica; that the Steuben County Bank and the Chemung Canal Bank were crowding them, and that they owed a number of other debts; that they wished to have this judgment in favor of the Bank of Utica, upon their property, because that bank was friendly to them and would protect them; that the judgment being for a large amount their creditors would not be likely to prosecute them, or force a sale of their property, and that they would have an opportunity to dispose of their lumber and pay up as far as it would go; and it would pay their debts or nearly so; that the claim of the Bank of Utica, as the witness then understood, was between seventeen and eighteen thousand dollars; that Hoffman proposed to give a judgment for a larger amount, somewhere between twenty-three and twenty-five thousand dollars; that upon the witness advising them not to give the judgment for more than was due, as they would be concluded by it, Hoffman replied he had no fears on that subject, for the cashier of the bank was a high-minded and honorable man, and would do what was right; that as one of the

other members of the firm expressed some reluctance to giving the judgment for so large an amount as Hoffman suggested, the witness inquired if they had the means of ascertaining what was actually due the bank, and they said they did not know that they had; that it was finally agreed that they should go home and make out a statement of the amount of such indebtedness, and that either the witness, or his partner, would call there in a few days and get the amount for which the judgment was to be entered; that in the course of the same conversation it was stated by them that they would have the control of the judgment; that it was not to be given because the Bank of Utica had requested it, but for their own safety; that they had given the bank a chattel mortgage which was a sufficient security; and that Hoffman said the Chemung Canal Bank and the Steuben County Bank had commenced war upon them, and that they took this step to protect themselves. The witness further testified that at the time the bond and warrant were executed he went to the store of Hoffman & Mersereau and they then presented to him a statement of their indebtedness to the Bank of Utica, and he inquired if that was the correct amount due, and they all agreed that it was more than they supposed was due, but said they had not the means of ascertaining precisely what was due to the bank; that the witness then inquired if he should make the bond and warrant for that amount, and Hoffman said yes; that they should probably want to get more money, and if the judgment was given for more than was due, they could get more and the judgment would be security for it; that the bond and warrant were accordingly filled up for the amount mentioned in the statement which they had prepared, and it was executed by the members of the firm of Hoffman & Mersereau; and that the witness then took them for the purpose of entering up the judgment thereon. The witness further stated, that before the judgment had been entered Hoffman called on him and inquired what he had done with the papers; and being told that the witness and his partner were in the habit of entering their judgments at the clerk's office at Geneva, inquired if it could not as well be entered at

Utica; that being answered in the affirmative, Hoffman said he was going to Utica in a few days and would take the papers to the agent of the witness at that place; and that he at the same time stated to the witness that he wished to leave the papers at Utica himself, so that it might not be known for some days that the judgment was entered, because the Steuben County Bank and the Chemung Canal Bank were about making some searches.

From this statement of the testimony of Cotton, it appears that the whole circumstances which he was called upon to disclose, except the mere fact of the execution of the bond and warrant, which was a matter of no consequence in the cause, were conversations of his clients in reference to the subject of his professional employment; which conversations it is wholly improbable they would have held with him if they had not been under the supposed seal of professional confidence. And I think the true principle in reference to privileged communications between attorney and client to be, that where the attorney is professionally employed, any communication made to him, by his client, with reference to the object or the subject of such employment, is under the seal of professional confidence, and is entitled to protection as a privileged communication. Such appears to be now the settled rule of the courts of England; although it was at one time attempted to confine the privileges to communications made in the prosecution or defence of a suit which had been, or was about to be commenced. The leading cases on the subject there are *Cromack* v. *Heathcote*, (2 *Brod. & Bing. Rep.* 4,) in the court of common pleas, and *Greenough* v. *Gaskell*, (1 *Myln & Keen's Rep.* 98,) and *Herring* v. *Clobery*, (1 *Phillips' Rep.* 91,) in the court of chancery. The last of these cases was preceded, in this state, by the very well considered opinion of Mr. Justice Bronson in the case of *Coveney* v. *Tannehill*, (1 *Hill's Rep.* 33,) in the supreme court. The same correct principles had long previously been recognized in this country, in the opinion of the late Judge Roane of the court of appeals of Virginia, in the important case of *Parker* v. *Carter and others*, (4 *Munf. Rep.* 273.) There a lawyer had

been employed by the grantor to prepare a deed, to be executed by him to a trustee, for his daughter and her issue. And although the client was dead, and the contest was between the parties claiming under such deed and the creditors of the son-in-law of the grantor, the attorney was not permitted to testify as to conversations of the grantor, in relation to the object and the subject matter of the deed ; for the purpose of showing that such deed was given to defraud the creditors of the daughter's husband.   For it is also a well settled principle in relation to privileged communications, between an attorney and his client, that the seal of confidence is not the seal of the attorney, but of his client.   The attorney is by law, as well as by professional honor, bound to keep the seal intact; and it cannot be removed except by the consent of the client.

Professor Greenleaf, in his very valuable and well arranged treatise on the law of evidence, very correctly observes , in relation to such communications, that the seal which the law once fixes upon them, remains forever ; unless removed by the party himself in whose favor it was there placed.   (*Greenl. Ev.* 278, § 243.)   And where the privilege belongs to several clients, I do not think any one of them, or even a majority, contrary to the expressed will of the others, can waive the privilege, so as legally to justify the attorney in giving testimony in relation to such privileged communications ; especially in a case like the present, where the testimony of the attorney, as to matters communicated to him professionally, equally affects the moral characters of all of his clients ; by showing that they employed him to assist them in giving a fictitious judgment for the purpose of defrauding their creditors.   Nor does the fact that the client, whose assent to the removal of the seal of professional confidence from privileged communications has not been obtained, is not a party to the suit in which his attorney is called upon to testify, alter the case.   (*Per Buller, J. in Wilson* v. *Rastall,* 4 *Term Rep.* 760.   *Rex* v. *Withers,* 2 *Camp. Rep.* 578.)

In this case it appears from the exemplification of the judgment, which is in evidence, that Cotton, the attorney, was a subscribing witness to the warrant of attorney, which he pre-

pared for Hoffman & Mersereau to execute.   But that does not
alter the case in reference to the admissibility of his evidence
as to the declarations of his clients tending to the conclusion
that the object of giving the judgment was to hinder and delay,
their creditors in the collection of their debts, and that it was
given for a much larger sum than was justly due to the com-
plainant.   For the conversations with his clients, as to which he
volunteered his testimony, after the examiner had decided that
it was improper, were in no way connected with his character
of subscribing witness to the warrant of attorney.   The con-
versations which took place on or before the 20th of September,
the day on which the bond and warrant were dated, were pre-
vious to the preparation of those instruments; and were in ref
erence to the amount for which he should draw the bond and
warrant which he was about to prepare for them in his charac-
ter of their attorney.   The object of his inquiries, to which
many of their declarations were responsive, was to ascertain
the proper amount to be inserted in the bond and warrant; or
rather for what amount they desired to give a judgment to the
Bank of Utica.

In the case of *Robson* v. *Kemp*, (5 *Esp. N. P. Rep.* 53,)
which was cited by the counsel for the defendants, upon the
argument, to show that an attorney who becomes a subscribing
witness to an instrument is bound to disclose all that took place
at the time of its execution, Lord Ellenborough expressly
declared that the attorney was not bound to disclose what took
place in the preparation and concoction of the instrument
which he witnessed, or at any other time, not connected with
the execution of such instrument.   Thus an attorney who is
professionally employed to prepare a deed for his client, and
who afterwards witnesses its execution, may be compelled not
only to prove the execution of such deed, but also to testify
whether it was ante dated ; whether it was in the same form in
which it now appears at the time of its execution, or has been
altered ; and whether it was actually delivered at the time he
subscribed his name thereto, as a witness.   So if the deed has
been lost, or is in the hands of the adverse party who refuses to

produce it upon the trial, or for the purposes of the suit, the attorney who witnessed the deed may be compelled to testify, as to the contents thereof; although in the preparation of such deed he was professionally employed. (*See Lord Say and Seale's case*, 10 *Mod. Rep.* 40; *Assignees of Blakely* v. *Kemp*, 4 *Esp. Rep.* 235; *Lessee of Devoy* v. *Burke*, 2 *Fox & Smith's Rep.* 191.)

The seal of professional confidence I believe has never been held to cover a communication made to an attorney to obtain professional advice or assistance as to the commission of a felony or other crime which was *malum in se*. The opinion of Chief Baron Gilbert certainly was that the privilege of attorney and counsel did not extend to such cases. (1 *Gilb. Ev.* 277.) And as no one is entitled to the advice or assistance of counsel, or of an attorney, to enable him to do an illegal act, if the question had arisen for the first time in this case, I should have no hesitation in deciding that the communications made by Hoffman & Mersereau to their attorney were not privileged; because they were made for the purpose of getting his professional assistance in the perpetration of a fraud upon their creditors. It is as contrary to the duty of an attorney, or a counsellor, to aid his client, by professional services, in the perpetration of a fraud, or in the violation of any law of the state, as it is to aid him in the commission of a felony; although the moral turpitude of the act may be much greater in the one case than in the other. I can therefore see no good reason for extending the principle of privileged communications to the first class of cases, and not to the last. The practice, however, appears to have been otherwise for more than a century and a half; and I do not now feel authorized to adopt a new rule on the subject.

As early as 1693, in the anonymous case, reported by Skinner, which was tried before Chief Justice Holt at the sittings after Michaelmas term, in the 5th of William and Mary, an attorney who had drawn an agreement between a sheriff and his under sheriff was called to prove that such agreement was corrupt and illegal. But the professional privilege was extend-

The Bank of Utica v. Merscreau.

ed to the case. (*Skin.* 404. *Holt*, 76.) By referring to another report of the same case, from the collections of Lord Chief Justice Raymond, it will be seen that the agreement, which the attorney was called to prove the illegality of, was an agreement made in violation of the statute against buying and selling offices. (1 *Ld. Raym. Rep.* 733.) Justice Buller has also a note of the same case, by the title of *Holt* v. *Tyrrel.* (*Bull. N. P.* 284.) But he is evidently wrong in supposing it was decided in the 13th year of the reign of George the First. For Lord Chief Justice Holt died in 1709 ; five years before the commencement of that reign. In the case of *Cromack* v. *Heathcote*, (4 *J. B. Moore's Rep.* 387,) an attorney had been applied to for the purpose of drawing a fraudulent assignment which he declined doing ; and the assignment was subsequently drawn by some other person. The attorney first applied to was offered as a witness to prove the fraud. But the court rejected the evidence ; upon the ground that the communications made to the attorney were privileged. So in the case of *Hyde* v. *M——*, (1 *Moll. Rep.* 450, *n.*) the client consulted an attorney as to the best manner of evading the demands of his creditors, and the attorney recommended a fraudulent mortgage, which he prepared accordingly. The attorney being examined as a witness to prove those facts, the master of the rolls suppressed the deposition ; as being a breach of professional confidence. And in *Doe* v. *Harris*, (5 *Car. & Pay. Rep.* 592,) where the question was whether the deed given by an insolvent, was not fraudulent ; the attorney was asked whether the insolvent had not called upon him to draw the deed for the purpose of defrauding his creditors. Mr. Justice Park rejected the evidence, as a violation of the professional privilege. A similar decision was made by the supreme court of Massachusetts, in the case of *Foster* v. *Hall*, (12 *Pick. Rep.* 89 ;) where the client was not a party to the suit, and the attorney was called upon to show that he was consulted by the grantor, in relation to the making of a deed to the complainant. The object of calling the attorney being to establish the fact that such deed was fraudulent. In the case of *Clay* v. *Williams*, (2 *Munf.*

---

The Bank of Utica v. Mersereau.

---

*Rep.* 105,) where an attorney had been examined as a witness in the court of chancery, and testified that he was employed to draw the bond in controversy, and that it was given for the purpose of defrauding creditors, two of the judges of the court of appeals in Virginia appear to have considered the deposition as legal evidence. But Judge Roane held the matters confided to the attorney, by the parties who employed him to draw the fraudulent deed, to be privileged communications; and that the testimony of the witness, as to the disclosure of the fraudulent object of giving the deed, should be disregarded. The question however was not decided; the other member of the court who heard the argument of the case expressing no opinion upon that point, which did not affect the decree to be made by the court. With the exception of what was said by Mr. Justice Bronson in *Coveney* v. *Tannehill*, (1 *Hill's Rep.* 36,) my researches have not enabled me to find any thing in conflict with the decisions to which I have referred. I therefore do not feel authorized to say that the fact that Cotton was employed by Hoffman & Mersereau to assist them in a transaction which, from what was said in his presence, he must have known to be a fraud upon their creditors, deprived their communications of the seal of professional confidence. I admit, however, that I should have been much better satisfied if I had found this question an open one; or rather if I had found the decisions of the courts the other way. For I think with the late chief justice of our supreme court, that the privileged relation of attorney and client ought to be permitted to exist only for honest purposes; but not to enable the client to perpetrate a fraud, or to violate the laws, under the advice of counsel, or through any other professional aid.

For the reasons before stated, however, the application of the complainant to suppress the testimony of Cotton ought to have been granted by the vice chancellor. And so much of the decree appealed from as denies that application with costs, must be reversed.

Upon the question of fraud, if the testimony of Cotton could have been received, and the explanations of Hoffman rejected,

it would have been very difficult to bring the mind to a conclu
sion that the judgment was not in fact given for much more
than was justly due from Hoffman & Mersereau at the date of
the bond and warrant. Even with the testimony of Hoffman,
I am not perfectly satisfied that the Mersereaus were interested
in the firm of Love, Pickering & Co. And if they were not,
the Bank of Utica probably had no legal claim upon the firm
of Hoffman & Mersereau for payment of any of the notes of
Love, Pickering & Co. which were endorsed by C. Hoffman
only. But I think the counsel for the defendants was wrong
in supposing that only about $17,500 could properly have been
included in the judgment. It is true, the statement which
Hoffman furnished to the banks about the first of June, 1834,
only showed an indebtedness of about $17,000 from Hoffman &
Mersereau to the Bank of Utica. And this was probably for
the amount due upon the eight notes and drafts, copies of
which were sent to Groom, at Port Deposit, in Hunt's letter
of the 13th of August, 1834; and as constituting the debts
which were secured by the mortgage upon the lumber. It ap-
pears in that statement which was furnished to the banks,
however, that Hoffman & Mersereau owed to Joel Hoffman
about $3300. And probably that indebtedness was for the two
notes of $1200 each, and the one note of $800, drawn by some
of the members of the firm and endorsed by other members
thereof; and upon which Joel Hoffman's name also appeared
as an endorser. He may therefore have gotten those notes dis-
counted at the bank on his own account. And as the firm of
Hoffman & Mersereau were not the makers of those notes, they
would not upon the books of the bank be charged to the ac-
count of that firm; although they were in fact given to Joel
Hoffman for debts of Hoffman & Mersereau, and the names of
all the members of the firm were on the notes, as makers or
endorsers. It will be seen that the amount of these three notes
and of the eight drafts and notes of which copies were sent to
Groom as being those included in the chattel mortgage, together
with the note of $1575, of Love, Pickering & Co., all of which
are embraced in the exhibit T. C. C., with the interest thereon

The Bank of Utica v. Mersereau.

to the 20th of September, 1834, and the costs of protest, correspond exactly with the sum which was inserted in the bond and warrant of that date. This part of the exhibit T. C. C. must have been made at or before the time of the execution of those instruments at the store of Hoffman & Mersereau. And by a reference to the testimony of T. L. Mersereau, it will be seen that in a conversation previous to the execution of the bond and warrant, Hoffman agreed to ascertain and make a calculation of the amout due as near as he could. (*Defts. Dep.* 399.) This supposition is also supported by the testimony of Colling, the book-keeper of the bank. For that witness testifies that Hoffman presented that statement, of the debts included in the papers upon which the judgment was to be entered ; and that the witness was called upon to compare that statement with the notes and drafts then held by the bank, and to see if they corresponded in dates and amounts with such statement. The witness made some corrections in red ink ; which were only additions of the names of other persons who had endorsed some of the paper. And he added at the bottom of the statement, also in red ink, the amount and particulars of two other notes, drawn by Love, Pickering & Co., then held by the bank, and of one note of Giles Love ; all three of which were endorsed by Chancey Hoffman, one of the members of the firm of Hoffman & Mersereau. The names of the other two members of the firm of Hoffman & Mersereau did not appear upon either of the three last mentioned notes, or upon the $1575 note of Love, Pickering & Co. which was embraced in the statement on which the bond and warrant were based, as prepared by Hoffman. The book-keeper therefore probably could not know whether the bank had any claim upon the firm of Hoffman & Mersereau for the payment of either of those four notes. But from his testimony I have no doubt that the Bank of Utica, at that time, actually held all the notes and drafts embraced in the exhibit T. C. C. ; amounting in the aggregate to more than $26,000. And as John G. Mersereau and James G. Mersereau were either drawers or endorsers of all the other drafts

The Bank of Utica *v.* Mersereau.

and notes embraced in that statement, they were prima facie liable to the bank for the payment thereof.

The giving of the bond and warrant, by all the members of the firm of Hoffman & Mersereau, for the amount of the $1575 note of Love, Pickering & Co. is presumptive evidence that they were legally or equitably liable for the payment of that note; either because they were interested in the last mentioned firm as copartners, or because it was an accommodation note made and discounted for their benefit. And the defendants, who insist that the taking of a judgment, and including therein the amount of that note, is evidence of an intention to defraud other creditors of Hoffman & Mersereau, are bound to satisfy the court that the officers of the bank have intentionally allowed a debt to be included in the judgment for which the bank had no legal or equitable claim upon the judgment debtors.

Although the testimony of Hoffman, contradicted as it is, in many particulars, by the testimony of other witnesses, has not entirely satisfied me that this $1575 note was properly included in the judgment, the manner in which the members of this firm did their business, and the complicated nature of their various transactions were such that I cannot say the fact is established that such note ought not to have been included. Much less have the defendants established, by any legal testimony, that even the members of that firm intentionally included in the judgment a debt which they knew they ought not to pay; and with the corrupt intention of defrauding their other creditors.

It may also be proper to observe, that if the whole amount included in the judgment was justly due to the Bank of Utica, from Hoffman & Mersereau, any expectation on the part of the members of that firm, or of any of them, that the judgment would be used for the purpose of enabling them to delay or hinder their other creditors, would not render the judgment fraudulent, as to the bank; unless there was some agreement, or at least an intention, on the part of some of the officers of that institution, that the judgment should be thus used. But if the bank was already amply secured for all its legal and

.equitable claims against Hoffman & Mersereau, by virtue of the mortgage upon the lumber at Port Deposit, in Maryland, the taking of this judgment and thereby creating a lien upon all the property of their debtors in this state, might be evidence of such an intention to defraud other creditors.

. The letter of the cashier, to Hoffman, post-marked at New-York the 14th of September, is relied upon by the defendants to show that the cashier not only considered the chattel mortgage an ample security for all the debts due to the bank, but that he had made a journey from New-York to Philadelphia for the sole purpose of suggesting the giving of a judgment merely to delay the other creditors of Hoffman & Mersereau in the collection of their honest debts. Such undoubtedly is the construction which a person having but a slight knowledge of human nature would be likely to put upon that letter. My understanding of it is directly the reverse of that, however, when I view it in connection with other facts which are in evidence in this cause. I think the cashier at that time had become seriously alarmed as to the safety of the debts due to the bank; and that he went to Philadelphia for the purpose of seeing Hoffman, and to induce him, if possible, to persuade his copartners to unite with him in a judgment; which would give the bank a further security for its debts by a lien upon their real property in this state. I can well see then, that he was indeed "*mortified* as well as *vexed*," when he supposed Hoffman and his friend Love had kept out of the way to avoid seeing him. This letter, therefore, was probably written to remove the impression that the cashier had visited Philadelphia to press Hoffman for the debts due the bank. And most of it may be considered what is vulgarly called *soft sodder*. This letter was probably forwarded to Erwin Centre, and was received there by Hoffman previous to the giving of the bond and warrant; and if so it had the effect intended, of uniting him to the purposes of the cashier.

But there is nothing in this letter from which it can be fairly inferred that the cashier "had intended to suggest" the giving of a judgment for any thing more than was honestly due from

The Bank of Utica *v.* Mersereau.

Hoffman & Mersereau to the bank.    And probably the includ
ing therein the three notes upon which Joel Hoffman's name
appears as endorser, and which I have supposed were discounted
by the bank as business paper of Hoffman & Mersereau held
by him, was probably done upon Chancey Hoffman's own sug-
gestion ; for the protection of Joel Hoffman, who was perhaps
a near relative.

From the evidence in the case I am not prepared to say that
the chattel mortgage upon the lumber at Port Deposit was a
full and ample security, even for the eight notes and drafts
mentioned therein.    And it was no security whatever for these
three notes on which Joel Hoffman's name appears.    Upon the
whole, I think the vice chancellor was right in supposing that
the defendants had failed in showing that the judgment of the
10th of October, 1834, was fraudulent and void as against the
defendant banks, and other creditors of Hoffman & Mersereau.

No one can justify the gross and deliberate fraud which was
practised upon the defendant banks, in inducing them to give
up the paper which they held against Hoffman & Mersereau,
and to allow an extended credit for the greater portion of their
debts, upon the supposition that they were obtaining valid se-
curities, by mortgage, upon the real estate of their debtors, free
from all prior incumbrances.    And the fact that such a fraud
was committed, and that Hoffman was the principal therein,
detracts very much from the credit to which he might otherwise
have been entitled as a witness.    But as the Bank of Utica and
its officers had no knowledge of, and no participation in that
fraud, it can only affect that bank so far as it affects the char-
acter of the principal witness of the complainant in this suit.

I think the evidence in the case fully establishes the fact that
the Bank of Utica, by its agents, accepted of the chattel mort-
gage, which was executed by two of the members of the firm
of Hoffman & Mersereau.    Whether the mortgage was valid
to convey the interest of the copartnership to the complainant,
in the form in which the mortgage was executed, is a question
upon which it is not necessary to express an opinion.    But even
upon the supposition that the property was properly pledged to

The Bank of Utica *v.* Mersereau.

the Bank of Utica, for the security of a part of the debt for which this judgment was confessed, I do not see how it can avail the defendants as a defence to this suit. There is no pretence, I think, for insisting that the complainant was answerable to Hoffman & Mersereau for the proceeds of the mortgaged lumber which had been sold by any of the members of that firm, or by persons in their employ, previous to the dissolution of the attachment. The mortgage money was not payable until the first of December, 1834. Of course the complainant had no right, nor any authority from the mortgagors, to sell any of the lumber previous to that time. And if Hoffman was agent for the mortgagee, it was only to do what the Bank of Utica was itself authorized to do; that is, to take care of the property and prevent it from being lost, until the mortgage became payable. Before that time arrived the property was attached; and it remained in the custody of the law until some months afterwards. No part of the debts secured by that mortgage had been paid by any sales of lumber at the time the judgment was given. Nor has any part of those debts been actually paid by the proceeds of any sales thereof since that time; though there is evidence to show that, subsequent to the dissolution of the attachment, Hoffman was authorized, by the officers of the Bank of Utica, to sell that part of the mortgaged lumber which he took to Philadelphia. Most of the proceeds of the mortgaged lumber, however, whether sold by Hoffman or by James G. Mersereau; were applied to the use of the firm of Hoffman & Mersereau, either in the payment of debts or otherwise. The only equitable claim, that the defendant banks can have upon the complainant, therefore, arising out of this chattel mortgage, must be that having two securities for a part of the debt embraced in the judgment, and knowing that the defendant banks had a specific lien by mortgage upon the property covered by one of those securities only, it was inequitable to permit Hoffman and Mersereau to receive or have the benefit of the property embraced in the other security; but that the proceeds of the lumber mortgaged should have been applied in payment of the judgment, pro tanto. The vice chancellor is right, however,

in supposing that there is no evidence that the Bank of Utica, or its officers, had any notice of the giving of the mortgages to the defendant banks, until it was too late to secure the mortgaged lumber, or the proceeds of it.

But as a part at least of the debts secured by the judgment, which were not embraced in the chattel mortgage, would still have remained unpaid, the complainant, even in equity, would still have acquired a good title to the premises in controversy in this suit ; for the recovery of which premises this ejectment bill has been filed. The only remedy for the defendant banks, therefore, was by a cross bill, or more properly an original bill, on their part, to recover a part of the proceeds of the sheriff's sale ; or for an account and payment of so much of the proceeds of the sale of the mortgaged lumber as the complainant might with proper diligence have secured and applied to the payment of the judgment, after notice received of the equitable rights of the defendant banks by reason of their mortgages upon the premises in controversy.

For these reasons the decree appealed from must be reversed and modified, as before suggested, in relation to the suppression of the testimony of Hoffman and of Cotton ; and it must be affirmed in all other respects. Neither party having succeeded fully upon these appeals, it is not a proper case to give costs upon such appeals to either party against the other. And as it appears from the defendant's notice of appeal, that they gave security, as required by the revised statutes, to stay the complainant's proceedings pending the appeal, the usual directions must be given for the payment, by the Steuben County Bank, and the Chemung Canal Bank, of the value of the use and occupation of the premises during the pendency of the appeal; and for any damages which the complainant may have sustained by the commission of waste in the meantime.